GIBSON, DUNN & CRUTCHER LLP
DOUGLAS FUCHS, SBN 196371
  DFuchs@gibsondunn.com
NICOLA HANNA, SBN 130694
  NHanna@gibsondunn.com
DANIEL NOWICKI, SBN 304716
  DNowicki@gibsondunn.com
JIMMY ROTSTEIN, SBN 305072
  JRotstein@gibsondunn.com
RAYCHEL TEASDALE, SBN 335034
  RTeasdale@gibsondunn.com
BRENNA GIBBS, SBN 342388
  BGibbs@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071
Telephone:  213.229.7000
Facsimile:   213.229.7520

*Attorneys for Defendant*
*Andrew A. Wiederhorn*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:24-CR-00296-WLH |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT ANDREW WIEDERHORN'S MOTION TO DISMISS THE INDICTMENT** |
| v. | |
| ANDREW A. WIEDERHORN, | |
| Defendant. | **Indictment Filed**: May 9, 2024<br>**Pretrial Conference**: February 7, 2025<br>**Trial**: February 18, 2025<br>**Speedy Trial Date**: April 3, 2025<br>**Hearing Date**: August 23, 2024<br>**Hearing Time**: 9:30 a.m.<br>**Dept**: Courtroom 9B<br>**Judge**: Honorable Wesley L. Hsu |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................. 1

II.    BACKGROUND ............................................................................................. 4

    A.    The Prior Convictions ......................................................................... 4

        1.    The Gratuities Charge ............................................................. 5

        2.    The False Tax Return Charge .................................................. 6

    B.    Mr. Wiederhorn Serves His Sentence And Reenters Society ...................................... 7

    C.    *Duarte* Is Published, But The Government Indicts Mr. Wiederhorn Anyway ............ 8

III.    LEGAL STANDARD .................................................................................... 8

IV.    ARGUMENT .................................................................................................. 9

    A.    Citizens Cannot Be Permanently Stripped Of Second Amendment Rights Merely Because They Were Convicted Of A Nonviolent Felony .............................. 9

        1.    Firearm Restrictions Must Be Supported By Tradition ................................... 9

        2.    *Duarte* Holds Section 922(g)(1) Is Unconstitutional As Applied To A Citizen Convicted Of Non-Violent Felonies ...................... 11

    B.    Under *Duarte* And *Bruen*, 922(G)(1) Is Unconstitutional As Applied To Mr. Wiederhorn ............................................................................................ 12

        1.    Mr. Wiederhorn's Right To Possess A Pistol And Ammunition Is Protected By The Plain Text Of The Second Amendment ............................ 12

        2.    The Government Cannot Show 922(G)(1), As Applied To Mr. Wiederhorn, Is Consistent With This Nation's Historical Tradition Of Firearm Regulation .......................................... 13

            a.    18 U.S.C. § 1954: Payment To An ERISA Plan Manager ................. 14

            b.    26 U.S.C. § 7206(1): Filing a False Income Tax Return ................... 15

    C.    The Court Should Not Grant The Government A Stay ............................. 17

        1.    *Duarte* Is Controlling Law ....................................................... 17

            a.    The Mandate Is Irrelevant .................................................. 18

            b.    *Duarte*'s Application Of *Miller* Is Controlling ................................. 18

        2.    The Government Should Not Be Rewarded For Ignoring *Duarte* ................. 19

V.    CONCLUSION ............................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Berger v. United States*,
   295 U.S. 78 (1935)...................................................................................................20

*Comm'r v. Leyman's Est.*,
   344 F.2d 763 (6th Cir. 1965), *vacated on other grounds*, 383 U.S. 832 (1966)............................16

*Hanson v. D.C.*,
   671 F. Supp. 3d 1 (D.D.C. 2023) ...............................................................................13

*Hart v. Massanari*,
   266 F.3d 1155 (9th Cir. 2001)...................................................................................19

*Jackson v. City & Cnty. of San Francisco*,
   746 F.3d 953 (9th Cir. 2014)....................................................................................13

*Kanter v. Barr*,
   919 F.3d 437 (7th Cir. 2019)................................................................................2, 12

*Miller v. Gammie*,
   335 F.3d 889 (9th Cir. 2003) .............................................................................1, 2, 18

*New York State Rifle & Pistol Association v. Bruen*,
   597 U.S. 1 (2022).....................................................................2, 9, 10, 11, 12, 14

*Rhode v. Bonta*,
   --- F.Supp.3d ----, 2024 WL 374901 (S.D. Cal. Jan. 30, 2024) ...............................13

*State of New York v. Mnuchin*,
   408 F. Supp. 3d 399 (S.D.N.Y. 2019), *aff'd*, 15 F.4th 569 (2d Cir. 2021)....................16

*United States v. Berry*,
   638 F. Supp. 2d 1163 (N.D. Cal. 2009) ......................................................................13

*United States v. Carranza*,
   289 F.3d 634 (9th Cir. 2002)......................................................................................9

*United States v. Davis*,
   33 F.4th 1236 (9th Cir. 2022).....................................................................................8

*United States v. Duarte*,
   101 F.4th 657 (9th Cir. 2024)...............................1, 2, 3, 7, 11, 12, 13, 14, 16, 17, 19, 20

*United States v. Nukida*,
   8 F.3d 665 (9th Cir. 1993)..........................................................................................8

Gibson, Dunn &
Crutcher LLP

ii

*United States v. Peralta*,
    763 F. Supp. 14 (S.D.N.Y. 1991) .................................................................................19

*United States v. Phillips*,
    367 F.3d 846 (9th Cir. 2004) .......................................................................................13

*United States v. Qazi*,
    975 F.3d 989 (9th Cir. 2020) ..........................................................................................8

*United States v. Rahimi*,
    2024 WL 3074728 (U.S. June 21, 2024) ...............................................................3, 4, 10

*United States v. Sanchez-Gomez*,
    859 F.3d 649 (9th Cir. 2017) .......................................................................................18

*United States v. Vongxay*,
    594 F.3d 1111 (9th Cir. 2010) ..................................................................................2, 19

*In re Zermeno-Gomez*,
    868 F.3d 1048 (9th Cir. 2017) ...............................................................2, 3, 4, 17, 18, 19, 20

**Statutes**

18 U.S.C. § 1954 ...............................................................................................5, 14, 15

26 U.S.C. § 7206(1) .............................................................................................6, 15

Internal Revenue Code of 1939, ch. 2, 53 Stat. 1 (1939) ..............................................16

Welfare and Pension Plans Disclosure Act Amendments of 1962, Pub. L. No. 87-420,
    §17(e), 76 Stat. 42 (1962) ...........................................................................................15

**Other Authorities**

Donald Arthur Winslow, *Tax Penalties—"They Shoot Dogs, Don't They?"*
    43 Fla. L. Rev. 811 (1991) .....................................................................................16, 17

*Erisa 40 Timeline Alternate*, U.S. DEPARTMENT OF LABOR ...........................................14

Gerald Auten, *Capital Gains Taxation*, THE ENCYCLOPEDIA OF TAXATION AND TAX
    POLICY: URBAN INSTITUTE (1999) ...................................................................................16

H.R. Rep. No. 83-1337 (1954) ......................................................................................16

H.R. Rep. No. 87-998 (1961) ........................................................................................15

*History of PBGC*, PENSION BENEFIT GUARANTY CORPORATION ......................................14

*History: Title 26, U.S. Code*, UNITED STATES CENSUS ...................................................16

Gibson, Dunn &
Crutcher LLP

iii

*IRS History Timeline*, IRS (Jan. 18, 2024)..................................................................................16

U.S. Dep't of Just., Just. Manual § 9-27.300..............................................................................20

**Rules**

Fed. R. Crim. P. R 12(b)(3)(B)(v)..............................................................................................8

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS INDICTMENT

# I.    INTRODUCTION

Twenty years ago, Defendant Andy Wiederhorn pleaded guilty to two nonviolent crimes: payment of a gratuity to an ERISA plan manager, and misstatement of a capital loss on a tax return.  The government has now charged him with violating 18 U.S.C. § 922(g)(1)—alleging that a gun was found in his house, and his two prior convictions prohibit him from possessing a gun.  But the government indicted Mr. Wiederhorn after the Ninth Circuit already held, in *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), that 922(g)(1) "violates the Second Amendment" when applied to "a non-violent offender who has served his time in prison and reentered society."  *Id.* at 661.  Although a prior Ninth Circuit panel had held 922(g)(1) was constitutional, the *Duarte* court applied the rule of *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc)—which allows a later panel to overrule a prior panel decision—to hold that prior decision had been undermined by Supreme Court precedent.  *See Duarte*, 101 F.4th at 664–65.

*Duarte*—and its application of *Miller*—is binding in the Ninth Circuit.  And under *Duarte*, section 922(g)(1) cannot constitutionally be applied to Mr. Wiederhorn to strip him of his Second Amendment rights.

\*\*\*

Section 922(g)(1) declares that anyone found guilty of any crime punishable by more than one year in prison is prohibited from possessing a firearm for the rest of their life—regardless of whether the crime has anything to do with guns or violence.  Anyone who "twice operates a recording device in a movie theater in Utah or releases a dozen heart-shaped balloons as a romantic gesture in Florida will earn a lifetime ban on possessing a firearm under § 922(g)(1) because it is apparently a felony to do any of those things in those respective states."  *Duarte*, 101 F.4th at 690 (cleaned up).

For years, judges recognized that 922(g)(1)'s sweeping rule could not be squared with the historical tradition of the Second Amendment.  In 2019, now-Supreme Court Justice Barrett—then a Judge on the Seventh Circuit—dissented from a decision upholding 922(g)(1), explaining that the history and tradition of the Second Amendment

shows 922(g)(1) cannot constitutionally be applied to those convicted of *nonviolent* felonies: "History … demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are *dangerous*." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting). In 2022, Justice Barrett was vindicated in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), which overturned the decision upholding 922(g)(1) that she dissented from (among other cases), and held that all gun restrictions must be evaluated using a historical analysis. "[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19.

In *Duarte*, the Ninth Circuit applied the historical analysis required by *Bruen* to 922(g)(1) and held that the statute "violates the Second Amendment as applied to" the defendant in that case, "a non-violent offender who has served his time in prison and reentered society." *Duarte*, 101 F.4th at 661. The *Duarte* court "agree[d] with now-Justice Barrett" in her *Kanter* dissent that the Founders were not concerned with disarming "felons in particular or even criminals in general but those whose conduct threatened violence and the risk of public injury." *Id.* at 678 (cleaned up).

*Duarte* recognized that, prior to *Bruen*, a Ninth Circuit panel held in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), that 922(g)(1) was constitutional. *See Duarte*, 101 F.4th at 664. But under *Miller*, "where the reasoning or theory of [a] prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, … the prior circuit opinion [is] ... effectively overruled." *Miller*, 335 F.3d at 893. *Duarte* held that, under the *Miller* rule, *Vongxay* was effectively overruled by *Bruen*, because *Vongxay* did not even attempt to apply the historical analysis *Bruen* requires. *See Duarte*, 101 F.4th at 665.

*Duarte* was published at 9:08 a.m. the morning of May 9, and, as of that moment, became controlling precedent in this Circuit. *See In re Zermeno-Gomez*, 868 F.3d 1048, 1052 (9th Cir. 2017) ("[A] published decision of this court constitutes binding authority

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS INDICTMENT

which must be followed unless and until overruled by a body competent to do so."
(quotations omitted)).  But the government chose not to follow *Duarte*.  Later on May
9—after *Duarte* had issued—the government indicted Andrew Wiederhorn, the
defendant in this case, for allegedly violating 922(g)(1).  According to the indictment,
Wiederhorn violated the statute by possessing a firearm in 2021 after being convicted in
2004 for (1) providing a thing of value (or "gratuity") to the administrator of an ERISA
plan, in violation of 18 U.S.C. § 1954, and (2) filing a tax return with a false statement
in violation of 26 U.S.C. § 7206(1).  Neither crime involves conduct that is remotely
violent or dangerous.  And the indictment does not suggest that either crime satisfies the
historical test set out in *Duarte* (and *Bruen*)—the indictment does not allege either crime
is analogous to any Founding-era crime that would have supported disarmament.
*Duarte*, 101 F.4th at 689.  To the contrary, the indictment alleges these convictions are
qualifying offenses under 922(g)(1) merely because they are "punishable by a term of
imprisonment exceeding one year" (ECF No. 1 at 2), even though *Duarte* held
"committing any crime punishable by imprisonment for a term exceeding one year" is
not enough for a 922(g)(1) charge (*Duarte*, 101 F.4th at 690).  In plain terms, the
government indicted Mr. Wiederhorn for a crime that does not exist under binding
precedent.

Although the government ignored *Duarte* when charging Mr. Wiederhorn, *Duarte*
is "binding authority and must be followed."  *Zermeno-Gomez*, 868 F.3d at 1053.  And
the Court should dismiss the indictment, because the government cannot carry its burden
under *Duarte* of showing that Mr. Wiederhorn's prior convictions for ERISA gratuities
and a tax return misstatement "were, by Founding era standards, of a nature serious
enough to justify permanently depriving him of his fundamental Second Amendment
rights."  *Duarte*, 101 F.4th at 691.  There is no historical evidence that the Founding
generation would have considered these nonviolent offenses sufficient to justify
stripping a defendant of his Second Amendment rights forever.  Indeed, two weeks ago
the Supreme Court emphasized in *United States v. Rahimi* that the Second Amendment

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS INDICTMENT

treats *violent* citizens differently from *nonviolent* ones:  "our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not."  602 U.S. --, 2024 WL 3074728, at *10 (2024).  There is no evidence that the Founders believed *nonviolent* offenders could be disarmed for the rest of their lives.

Because the government cannot carry its burden to show his prior convictions satisfy *Duarte*'s historical test, 922(g)(1) is unconstitutional as applied to Mr. Wiederhorn, and the indictment should be dismissed.  The government will likely argue in response to this motion—as it has in other cases—that this motion to dismiss should not be decided until the Ninth Circuit decides the government's petition asking to rehear *Duarte* en banc.  But *Duarte* is binding *now* and "must be followed unless and until it is overruled," which has not happened.  *Zermeno-Gomez*, 868 F.3d at 1053.

Moreover, allowing the government to wait to see if *Duarte* is overruled would effectively reward it for ignoring the law and charging a man who was innocent under the law at the time of the charge.  The government indicted Mr. Wiederhorn after *Duarte* had been published—this is not a case where the government charged a defendant with probable cause to believe the defendant was guilty, only for the law to change later, *after* the indictment had issued.  This is a case where the Ninth Circuit announced that individuals like Mr. Wiederhorn cannot be guilty of 922(g)(1)—and the government, disappointed in that ruling, simply ignored the Ninth Circuit and charged Mr. Wiederhorn anyway, hoping *Duarte* would eventually be vacated.

The government cannot charge an innocent man based on the hope that the law will later change to justify the charge.  922(g)(1) is unconstitutional as applied to Mr. Wiederhorn, the government had no probable cause to charge him, and this Court should dismiss the indictment immediately.

## II.    BACKGROUND

### A.    The Prior Convictions

The indictment in this case alleges that on December 1, 2021, Mr. Wiederhorn

4

possessed a firearm and ammunition "knowing that he had previously been convicted" of two offenses "punishable by a term of imprisonment exceeding one year": "Payment of Gratuities, in violation of Title 18, United States Code, Section 1954," and "Filing False Tax Return, in violation of Title 26, United States Code, Section 7206(1)." ECF No. 1 at 1-2. The indictment alleges that both convictions were obtained on June 3, 2004, in a case in the District of Oregon. *Id.*

The stipulated facts in the 2004 Oregon case make clear that Mr. Wiederhorn was not convicted of anything remotely dangerous or violent.

### 1. The Gratuities Charge

18 U.S.C. § 1954 prohibits the payment of "things of value" to ERISA plan managers, if the payment is made "because of" the plan manager's "actions, decisions, or other duties relating to any question or matter concerning such plan." In the Oregon case, the government and Mr. Wiederhorn stipulated that the "payment of gratuities" charge was based solely on Mr. Wiederhorn's decision to release an ERISA plan manager named Jeffrey Grayson from a loan guaranty in 1998. *See* Declaration of Douglas Fuchs, Ex. 1.

According to the stipulated facts for Mr. Wiederhorn's guilty plea, in the late 1990s, Mr. Wiederhorn was principal shareholder of Wilshire Credit Corporation (WCC). *Id.* ¶ 1. Mr. Grayson controlled Capital Consultants, Inc. (CCI), an investment adviser whose clients included ERISA benefit plans. *Id.* ¶ 2. From 1995 to 1998, CCI loaned ERISA plan funds to WCC, with the terms of the loans requiring WCC to maintain a cash collateral account holding approximately 15% of the loan total. *Id.* ¶ 4.

In 1997, Mr. Grayson asked Mr. Wiederhorn to purchase two loans CCI had made to a third-party company, THTFY, that was in default. *Id.* ¶ 6. The THTFY loans were comprised of investor funds, including ERISA plan funds. *Id.* Mr. Wiederhorn agreed to purchase the THTFY loans on the condition that Mr. Grayson guarantee repayment. *Id.* ¶¶ 7, 9.

In late 1998, Mr. Wiederhorn's companies suffered financial struggles as the

result of a global financial crisis and needed cash. *Id.* ¶ 10. Mr. Wiederhorn negotiated a loan with CCI as well as a release of funds held in the cash collateral accounts. *Id.* ¶ 10. In return, Grayson demanded Mr. Wiederhorn release the guaranties given by Grayson to repay the THTFY loans, and Mr. Wiederhorn agreed. *Id.* ¶¶ 10–11. According to the stipulation, this act of releasing the guaranties violated 18 U.S.C. § 1954, because it gave Grayson—an ERISA plan manager—"a thing of value because of actions, decisions, and other duties of Grayson related to questions and matter concerning the [ERISA] Plans." *Id.* ¶ 13.

### 2.    The False Tax Return Charge

26 U.S.C. § 7206(1) prohibits filing a tax return that includes a knowingly false statement; the government and Mr. Wiederhorn stipulated that he violated this statute by inappropriately claiming a capital loss on his 1998 tax return. According to the stipulation, in 1998, Mr. Wiederhorn and his then-wife, Tiffany, loaned money to an entity owned by their siblings called Specialty Finance Investors (SFI), which used the loans to buy stock in WFSG (of which Mr. Wiederhorn was CEO). *See* Fuchs Decl., Ex. 2 at ¶ 1. Later, after the stock value of WFSG declined, Wiederhorn's accountants at Arthur Andersen and his tax attorneys determined that the fair market value of the SFI loans was $17,439.77—representing a loss of roughly $7.4 million. *Id.* ¶ 4.

Mr. Wiederhorn's accountants and attorneys recommended he sell the loans to generate a capital loss, and Mr. Wiederhorn arranged to have an entity called "Longpond," owned by Mr. Wiederhorn's associate, purchase the loans at the $17,439.77 price—generating a $7.4 million loss, which was reported on Mr. Wiederhorn's 1998 tax return. *Id.* Mr. Wiederhorn and the government stipulated that this loss "was not legitimate," and not the result of a "true sale." *Id.* ¶ 5. However, the government and Mr. Wiederhorn also stipulated that the claimed loss did not matter to tax liability, because the Wiederhorns "suffered capital losses unrelated to their loans to SFI" that "exceeded" their capital gains, and thus "the capital loss attributable to the sale of the SFI notes did not result in any tax loss." *Id.* ¶¶ 6–7.

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS INDICTMENT

**B.    Mr. Wiederhorn Serves His Sentence And Reenters Society**

Mr. Wiederhorn pleaded guilty to the gratuity and tax return charges. At sentencing, the government acknowledged that Mr. Wiederhorn relied on his counsel and accountants in connection with the transactions underlying the § 1954 charge, and requested a 4-level downward departure because of Mr. Wiederhorn's "extensive reliance … on attorneys and accountants." Fuchs Decl., Ex. 3 at 63:10-15. The tax charge was irrelevant to sentencing because there was no loss to the government. *Id.* at 19:23-21:1. The Court agreed with the 4-level reduction, and Mr. Wiederhorn was sentenced to 18 months' imprisonment, received a $25,000 fine, and was ordered to pay $2 million in restitution. *United States v. Wiederhorn*, Case No. 04-cr-238-BK, ECF Nos. 10, 16 (D. Or. 2004). Mr. Wiederhorn paid the fine and restitution, and surrendered to the Bureau of Prisons on August 2, 2024. *Id.* at ECF No. 14. He was released from prison on November 22, 2005.

After his release, Mr. Wiederhorn began building a restaurant business from scratch, ultimately creating a remarkably successful company that is the 25th largest restaurant company by unit count in the U.S., with $2.5 billion in global sales across 40 countries. His business includes prominent restaurant brands like Fatburger, Johnny Rockets, Twin Peaks, and Round Table Pizza, among others.

In 2021, the government sought and obtained a search warrant for Mr. Wiederhorn's home, based on an affidavit alleging that Mr. Wiederhorn had engaged in tax and wire fraud.[1] The government executed the search in a dawn raid on December 1, 2021; during the raid, government agents demanded that Mr. Wiederhorn reveal whether any weapons were in the house, and Mr. Wiederhorn explained that his son's gun was located in a gun box in a closet.[2] The government seized the gun and ammunition stored with it.

---

[1] In fact, the government's affidavit contained several false statements, and Mr. Wiederhorn intends to challenge the warrant if this case goes forward.

[2] Mr. Wiederhorn disagrees with the indictment's allegation that he—rather than his son—possessed the gun at issue. But that disagreement is not at issue in this motion.

Gibson, Dunn & Crutcher LLP

**C.    *Duarte* Is Published, But The Government Indicts Mr. Wiederhorn Anyway**

At 9:08 a.m. on the morning of May 9, 2024, the Ninth Circuit published *Duarte*, holding that, under *Bruen*, 922(g)(1) was unconstitutional as applied to Mr. Duarte, "a non-violent offender who has served his time in prison and reentered society." *Duarte*, 101 F.4th at 661.

Later in the day on May 9—after *Duarte* had already been published—the government indicted Mr. Wiederhorn for violating 922(g)(1). The allegations in the indictment in support of the 922(g)(1) charge are brief (spanning less than a full page), and allege only that (1) Mr. Wiederhorn "knowingly possessed a firearm … and ammunition"; and (2) Mr. Wiederhorn "possessed such firearm and ammunition knowing that he had previously been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year," with the only identified felonies being the 2004 convictions for "Payment of Gratuities" to an ERISA plan manager and "Filing [a] False Tax Return." ECF No. 1 at 1-2.

On June 5, 2024, counsel for Mr. Wiederhorn met and conferred with counsel for the government on a number of topics, including Mr. Wiederhorn's intention to file this motion to dismiss. The government refused to withdraw the indictment, and Mr. Wiederhorn now moves to dismiss the indictment on the grounds that 18 U.S.C. § 922(g)(1), as applied to him, is unconstitutional under the Second Amendment.

## III.    LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(3)(B)(v) provides that a defendant shall raise an indictment's "failure to state an offense" through a pretrial motion. An indictment must be dismissed if it "does not set forth each and every element of the offense," including "implied, necessary elements not included on the face of a statute" but recognized by caselaw. *United States v. Davis*, 33 F.4th 1236, 1240 (9th Cir. 2022); *see also United States v. Qazi*, 975 F.3d 989, 992 (9th Cir. 2020) ("If a defendant properly challenges an indictment before trial and … we determine the indictment omitted an essential element, [Ninth Circuit precedent] requires automatic dismissal

8

1  regardless of whether the omission prejudiced the defendant.").

2  Similarly, an objection that a charging statute is unconstitutional is properly raised

3  on a motion to dismiss: "A motion to dismiss is generally capable of determination

4  before trial if it involves questions of law rather than fact," (*United States v. Nukida*, 8

5  F.3d 665, 669 (9th Cir. 1993) (quotations omitted)), and the "constitutionality of a statute

6  is a question of law," (*United States v. Carranza*, 289 F.3d 634, 643 (9th Cir. 2002)).

## IV.   ARGUMENT

8  In *Duarte*, the Ninth Circuit held that, based on the history and tradition of the

9  Second Amendment, 922(g)(1) was unconstitutional as applied to a non-violent felon.

10  Applying this rule to Mr. Wiederhorn's case commands the same result.

### A.   Citizens Cannot Be Permanently Stripped Of Second Amendment Rights Merely Because They Were Convicted Of A Nonviolent Felony

#### 1.   Firearm Restrictions Must Be Supported By Tradition

14  In June 2022, the Supreme Court issued *Bruen*, establishing that firearm

15  restrictions on U.S. citizens are unconstitutional unless the government shows those

16  restrictions are consistent with the Nation's historical tradition of firearm regulation.

17  *Bruen* involved a challenge to New York's public carry licensing regime, which required

18  an applicant to show "proper cause" prior to issuance of a public carry permit. *Bruen*,

19  597 U.S. at 12. The Court held this licensing regime violated the Second Amendment

20  and stated that (1) "when the Second Amendment's plain text covers an individual's

21  conduct," (2) the government must justify any firearm regulation by proving it is

22  "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.

23  *Bruen* emphasized the first prong of this test is straightforward—the plain text of

24  the Second Amendment protects the right of U.S. citizens to "keep and bear arms," so a

25  prohibition on "the individual right to possess and carry weapons" presumptively

26  violates the Amendment. *Id.* at 32.

27  At the second step of the test, the government shoulders a heavy burden to

28  overcome the presumption of unconstitutionality. Under *Bruen*, the government must

Gibson, Dunn &
Crutcher LLP

9

proffer historical firearm regulations that are analogous along two dimensions—the historical analogue must impose a comparable burden on the Second Amendment right (the "how") and that burden must be comparably justified (the "why"). *Id.* at 29. Further, the government must provide more than "a few" historical analogues; the historical tradition must be "well-established" and "representative." *Id.* at 30, 46, 70.

This year, the Supreme Court issued *Rahimi*, reaffirming its holding in *Bruen* that the government "bears the burden to 'justify [firearm] regulation'" by showing the regulation fits within "our 'historical tradition of firearm regulation.'" *Rahimi*, 602 U.S.--, 2024 WL 3074728, at *6 (quoting *Bruen*, 597 U.S. at 17, 24). *Rahimi* held that Section 922(g)(8)—which *temporarily* prohibits firearm possession by those found to pose a "credible threat to the physical safety" of a domestic relation—fits within this tradition. *Id.* at *3.

*Rahimi* held that the Second Amendment distinguishes between *violent* and *nonviolent* citizens: "our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not." *Id.* at *10. Therefore, the Court held, "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at *11. Inasmuch as 922(g)(8) temporarily disarms "individuals found to threaten the physical safety of another," it is constitutional. *Id.* at *9.

Although *Rahimi* found Section 922(g)(8) was constitutional as applied to Mr. Rahimi because he was violent, it "reject[ed] the Government's contention" that the legislature can simply declare certain individuals to be not "responsible" and thus unworthy of possessing firearms. *Id.* at *11 ("[W]e reject the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.'"). The Supreme Court did not even hold that 922(g)(8) was constitutional in all its applications, instead holding only that it is constitutional inasmuch as it *temporarily* disarms individuals who *physically threaten* someone else. *Id.* at *11; *id.* at *16 (Gorsuch, J., concurring) ("[W]e

10

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS INDICTMENT

do not decide today whether the government may disarm a person without a judicial finding that he poses a 'credible threat' to another's physical safety.  We do not resolve whether the government may disarm an individual permanently.").

### 2.  *Duarte* Holds Section 922(g)(1) Is Unconstitutional As Applied To A Citizen Convicted Of Non-Violent Felonies

On May 9, 2024, the Ninth Circuit in *Duarte* applied *Bruen*'s historical analysis to 18 U.S.C. § 922(g)(1).  Defendant Duarte had five prior state criminal convictions and was charged under § 922(g)(1) after officers witnessed him toss a handgun out of a car.  *Duarte*, 101 F.4th at 661.  The court, applying *Bruen*, held that 922(g)(1) violated the "Second Amendment as applied to him, a non-violent offender who has served his time in prison and reentered society."  *Id.*

First, *Duarte* held that the Court's prior decision in *Vongxay* upholding 922(g)(1) as categorically constitutional had been abrogated by *Bruen*.  *Duarte* explained that, under rule of *Miller*, a Ninth Circuit panel may "reject [a] prior circuit opinion as ... effectively overruled" when the "*reasoning or theory* of [the] prior circuit authority" is inconsistent with the reasoning applied by a later Supreme Court decision.  *Id.* at 664 (quotations omitted).  *Duarte* held this was true for *Vongxay*, because *Vongxay* failed to apply *Bruen*'s historical analysis (understandably, given *Vongxay* predated *Bruen*), under which the government must "prove[] that its 'firearm regulation is consistent … with th[e] Nation's historical tradition.'"  *Id.* at 665 (quoting *Bruen*, 597 U.S. at 17).

*Duarte* next explained that, under *Bruen*'s step one, applying 922(g)(1) to Duarte's handgun possession intruded on the rights protected by the "plain text" of the Second Amendment, given that the Amendment protects "simple possession" of "a handgun."  *Id.* at 670–71.  *Duarte* also rejected the government's argument that the Second Amendment does not apply to anyone who happens to be convicted of a crime punishable by more than one year in prison, explaining that the Supreme Court's decision in *Heller* already resolved that the Amendment protects the rights of "all Americans."  *Id.* at 671.

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS INDICTMENT

Next, at *Bruen*'s second step, *Duarte* explained that the government cannot charge a citizen with violating 922(g)(1) unless it shows the defendant was previously convicted of the type of crime the Founders would have considered sufficiently dangerous to merit permanently stripping the defendant of the right to bear arms.  The Ninth Circuit held that no historical tradition supports 922(g)(1)'s categorical rule that citizens convicted of a crime punishable by more than a year in prison can never again possess a gun. *Duarte*, 101 F.4th at 688; *see also Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (there are no persuasive historical analogues for 922(g)(1)).  Instead, for 922(g)(1) to be constitutional as applied to a defendant, the government must show the defendant's prior convictions "were, by Founding era standards, of a nature serious enough to justify permanently depriving him of his fundamental Second Amendment rights." *Duarte*, 101 F.4th at 691.  This means the government must "proffer Founding-era felony analogues … punishable either with execution, with life in prison, or permanent forfeiture of the offender's estate"—i.e., the types of crimes the Founding generation would have deemed worthy of a lifetime disarmament. *Id.* at 690 (citing *Bruen*, 597 U.S. at 27).

**B.    Under *Duarte* And *Bruen*, 922(G)(1) Is Unconstitutional As Applied To Mr. Wiederhorn**

*Duarte* and *Bruen* compel dismissal here.  Applying 922(g)(1) to Mr. Wiederhorn infringes on his Second Amendment rights.  Mr. Wiederhorn has not been convicted of violent crimes the Founders would have considered sufficiently dangerous to warrant stripping him of those rights.

**1.    Mr. Wiederhorn's Right To Possess A Pistol And Ammunition Is Protected By The Plain Text Of The Second Amendment**

The first step of the *Duarte*/*Bruen* test asks whether a law restricts rights protected by the "plain text" of the Second Amendment. *Bruen*, 597 U.S. at 19; *Duarte*, 101 F.4th at 670–71.  That is the case here.  Mr. Wiederhorn is an American citizen alleged to have possessed a handgun and ammunition, which is conduct protected by the Second Amendment.

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS INDICTMENT

The indictment alleges that Mr. Wiederhorn violated § 922(g)(1) by "knowingly possess[ing]" a "pistol" of ".380 ACP" caliber and possessing ammunition of that caliber. ECF No. 1 at 1. *Duarte* holds that this alleged conduct is protected by the Second Amendment—the Amendment "protects the arm in this case (a handgun) and the conduct involved (simple possession)." *Duarte*, 101 F.4th at 671. The Amendment also protects Mr. Wiederhorn's alleged possession of ammunition: "without bullets, the right to bear arms would be meaningless." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (right to possess ammunition is protected by Second Amendment)[3]; *Rhode v. Bonta*, --- F.Supp.3d ----, 2024 WL 374901, at *4 (S.D. Cal. 2024) (stating it is well-settled in the Ninth Circuit that right to possess ammunition is constitutionally protected). And it is undisputed that Mr. Wiederhorn is "an American citizen" entitled to the Second Amendment's protections (*Duarte*, 101 F.4th at 671)—the government's own filings in this case repeatedly state that Mr. Wiederhorn is a "U.S. citizen." ECF No. at 2 (government's case summary stating Mr. Wiederhorn is a "U.S. citizen"); ECF No. 12 (receipt of Mr. Wiederhorn's "USA" passport).[4]

Mr. Wiederhorn thus easily passes *Bruen* step one. Because Mr. Wiederhorn's conduct is protected by the plain text of the Second Amendment, the government bears the heavy burden of showing it can strip Mr. Wiederhorn of his rights in this case.

**2.    The Government Cannot Show 922(G)(1), As Applied To Mr. Wiederhorn, Is Consistent With This Nation's Historical Tradition Of Firearm Regulation**

---

[3] *Jackson* ultimately concluded that the regulation at issue in that case satisfied the "intermediate scrutiny" test that the Ninth Circuit applied to firearms regulations before *Bruen*. *Jackson*, 746 F.3d at 968–69. Although *Jackson*'s tiers-of-scrutiny analysis has now been overruled by *Bruen*, the recognition that ammunition is protected by the Second Amendment remains good law. *See, e.g.*, *Rhode*, 2024 WL 374901, at *4; *see also Hanson v. D.C.*, 671 F. Supp. 3d 1, 9 (D.D.C. 2023) ("At least three Courts of Appeals have concluded that LCMs [i.e., ammunition magazines] are 'arms' within the meaning of the Second Amendment.").

[4] "[U]ndisputed facts" are properly considered on a motion to dismiss an indictment. *United States v. Phillips*, 367 F.3d 846, 855 (9th Cir. 2004); *United States v. Berry*, 638 F. Supp. 2d 1163, 1165 (N.D. Cal. 2009).

Gibson, Dunn &
Crutcher LLP

13

Because Mr. Wiederhorn's conduct is covered by the plain text of the Second Amendment, "[t]he Government now 'shoulder[s] the burden of demonstrating' at step two of *Bruen*" that Mr. Wiederhorn can be stripped of his right to bear arms. *Duarte*, 101 F.4th at 676. This means the Government must "proffer Founding-era felony analogues that are 'distinctly similar' to [Mr. Wiederhorn's] underlying offenses and would have been punishable either with execution, with life in prison, or permanent forfeiture of the offender's estate." *Id.* at 690 (quoting *Bruen*, 597 U.S. at 27).

The government has not attempted to meet its burden in the indictment, and it cannot meet its burden now. Mr. Wiederhorn was convicted under statutes that criminalize conduct that was not criminal at the time of the Founding. The government cannot show his "predicate offenses were, by Founding era standards, of a nature serious enough to justify permanently depriving him of his fundamental Second Amendment rights." *Id.* at 691.

### a. 18 U.S.C. § 1954: Payment To An ERISA Plan Manager

18 U.S.C. § 1954 prohibits providing a thing of value to ERISA plan managers. It is a modern-day statute concerned with a wholly modern-day issue: mismanagement of private employee benefit plans. It "was a nonexistent crime in this country" at the time of the Founding—and was not criminalized until 1962—and cannot support a 922(g)(1) charge. *Duarte*, 101 F.4th at 676.

ERISA and pension plan regulation is a distinctly 20th-century phenomenon. Private pension plans did not even exist in the United States until 1875, when the American Express Company established the first private pension plan in America. *History of PBGC*, PENSION BENEFIT GUARANTY CORPORATION, https://tinyurl.com/bdzm25kf. For decades after that, management of these plans was largely left to the private parties that created them. Congress did not create a comprehensive plan for private pension plan regulation until 1958, when Congress passed the Welfare and Pension Plan Disclosure Act (WPPDA), the "precursor" to ERISA. *Erisa 40 Timeline Alternate*, U.S. DEPARTMENT OF LABOR,

14

Gibson, Dunn & Crutcher LLP

1 | https://tinyurl.com/36fr4fjz.

2 |     Even the 1958 WPPDA did not criminalize the receipt of "gratuities" by pension

3 | plan administrators.  That did not occur until 1962, when Congress amended the

4 | WPPDA by enacting § 1954, which imposed criminal penalties for influencing benefit

5 | plan administrators by paying a thing of value.  Welfare and Pension Plans Disclosure

6 | Act Amendments of 1962, Pub. L. No. 87-420, § 17(e), 76 Stat. 42 (1962).  Until 1962,

7 | however, pension plan abuses—even "embezzlement and kickbacks"—were not directly

8 | prohibited.  *See* H.R. Rep. No. 87-998, at 1534 (1961) (recognizing that, prior to the

9 | passage of § 1954, these "abuses" were unregulated).  As Congress recognized, the

10 | passage of § 1954 in 1962 (and the enactment of other enforcement provisions of the

11 | 1962 amendments) marked a sea-change in pension plan regulation, for the first time

12 | providing that "meaningful penalties … be applied when wrongdoing is disclosed" in

13 | connection with pension plan administration.  *Id.* at 1536.

14 |     18 U.S.C. § 1954's history demonstrates that it criminalized conduct that, until

15 | the mid-twentieth century, was not regulated by criminal law.  The crime of paying

16 | gratuities to a pension plan administrator—and even the existence of private pension

17 | plans generally—would be entirely foreign to the Founding generation.  And there is no

18 | evidence that 18 U.S.C. § 1954 is similar to historical analogues that the Founders would

19 | have considered "serious enough to justify permanently depriving him of his

20 | fundamental Second Amendment rights."  *Duarte*, 101 F.4th at 691.

21 | **b.    26 U.S.C. § 7206(1): Filing a False Income Tax Return**

22 |     26 U.S.C. § 7206(1) criminalizes the filing of a false income tax return.  Like

23 | § 1954, 26 U.S.C. § 7206(1) is a modern law aimed at addressing a modern issue—

24 | namely, ensuring that income tax is properly reported and collected under the Internal

25 | Revenue Code (the "IRC").  The IRC—and income tax itself—were unheard of in the

26 | 18th century and for much of the 19th, and misreporting income tax was "a nonexistent

27 | crime in this country" at the time of the Founding.  *Id.*

28 |     There was no comprehensive system of federal taxation at the time of the

Founding, and no income tax. The only taxes were either customs levies or ad-hoc excise taxes (like the whiskey tax). *See State of New York v. Mnuchin*, 408 F. Supp. 3d 399, 403 (S.D.N.Y. 2019), *aff'd*, 15 F.4th 569 (2d Cir. 2021); *Comm'r v. Leyman's Est.*, 344 F.2d 763, 767 (6th Cir. 1965), *vacated on other grounds*, 383 U.S. 832 (1966). Congress passed the first income tax in 1862 to collect taxes to pay for the Civil War, and federal tax laws would not be systematically codified until decades later. *IRS History Timeline*, IRS (Jan. 18, 2024), https://tinyurl.com/irshistory; *History: Title 26, U.S. Code*, UNITED STATES CENSUS, https://tinyurl.com/ywhttn4h.

The crime at issue here—filing a false tax return under penalty of perjury—did not exist until 1939, when it was codified along with the rest of the IRC. *See* Internal Revenue Code of 1939, ch. 2, 53 Stat. 1 (1939). The 1939 Act included enforcement provisions threatening criminal penalties for noncompliance with the new tax regime, including section 3809(a)—the predecessor to the modern 7206(1)—which prohibited "making a false declaration under penalty of perjury" in a tax document. H.R. Rep. No. 83-1337, at 4573 (1954).

This history—like the history of § 1954—demonstrates that 26 U.S.C. § 7206(1) "was a nonexistent crime in this country" at the time of the Founding. *Duarte*, 101 F.4th at 691. The statute punished conduct—false misstatements on an income tax form— that was unknown to the Founders, and certainly not the subject of harsh criminal penalties. The distinctly modern nature of Mr. Wiederhorn's 26 U.S.C. § 7206(1) violation is further confirmed by the fact that his conviction turned on the false reporting of a capital loss. *See* Fuchs Decl., Ex. 2 at ¶¶ 2, 4. Capital gains taxation did not exist in the United States until 1913—and the concept of misreporting a capital loss would have been foreign to the Founders. *See* Gerald Auten, *Capital Gains Taxation*, THE ENCYCLOPEDIA OF TAXATION AND TAX POLICY: URBAN INSTITUTE (1999), https://tinyurl.com/yeyvdhm3.

The Founders' only exposure to "tax fraud" in any sense would have been in connection with statutes that prohibited concealing the existence of imported goods

16

subject to a customs duty.  *See* Donald Arthur Winslow, *Tax Penalties—"They Shoot Dogs, Don't They?"*, 43 Fla. L. Rev. 811, 821–22 (1991).  These customs enforcement laws bear no resemblance to 26 U.S.C. § 7206(1) and the criminal penalties set up to enforce the IRC.  In any event, the harshest penalties these customs laws imposed for fraudulently avoiding customs duties were *fines*, not life in prison or death.  *See id.* (identifying the harshest penalty for false reporting of the value of imported goods as a fine equal to several times the value of the goods).

Simply put, the Founding generation would not have considered falsely reporting tax information to be the kind of crime that justified stripping a citizen of his Second Amendment rights for life.  The government cannot show that filing a false tax return is analogous to crimes that would have been punished by "execution, … life in prison, or permanent forfeiture of the offender's estate" at the time of the Founding, so Mr. Wiederhorn's conviction under 26 U.S.C. § 7206(1) cannot support a 922(g)(1) charge. *Duarte*, 101 F.4th at 690.

## C.    The Court Should Not Grant The Government A Stay

The government will likely respond to this motion by arguing—as it has in other cases—that the Court should not act until the Ninth Circuit decides the government's petition asking to rehear *Duarte en banc*.  This would reward the government for ignoring the law.  After *Duarte* was published, the government pressed forward with charging Mr. Wiederhorn under 922(g)(1)—even though he was innocent under *Duarte*. Granting the government a stay would reward it for ignoring the law, and the indictment should be dismissed immediately, as *Duarte* requires.

### 1.    *Duarte* Is Controlling Law

The government has suggested in other cases that *Duarte* is not precedential because the Ninth Circuit has not yet issued the mandate, and that *Duarte* can be ignored because it disagreed with a prior Ninth Circuit panel (i.e., *Vongxay*).

Neither argument is correct, and *Duarte* is binding.  *Duarte* "constitute[d] binding authority" as soon as it was published, regardless of whether the mandate issued.

*Zermeno-Gomez*, 868 F.3d at 1052.  And *Miller* squarely holds that a later panel may overrule a prior panel if the later panel believes intervening authority has undermined the prior panel decision.  District courts cannot second-guess the *Duarte* opinion's application of *Miller*—were it otherwise, *Miller* would be a dead-letter, as no Ninth Circuit panel's application of *Miller* would be respected by the district courts.

### a.    The Mandate Is Irrelevant

*Zermeno-Gomez* involved the same "mandate" argument the government has raised here—in that case, the government argued that district courts did not need to follow the Ninth Circuit's decision in *United States v. Sanchez-Gomez*, 859 F.3d 649 (9th Cir. 2017), because the mandate had been stayed while the government sought further *en banc* or Supreme Court review.  *See Zermeno-Gomez*, 868 F.3d at 1050–51.  Several district courts agreed, and "[c]iting the stay of the mandate, … found that *Sanchez-Gomez* was not binding on them."  *Id.* at 1051.

The Ninth Circuit issued a writ of mandate reversing those district courts, explaining the government's argument was "mistaken" and that the "mandate" is irrelevant to whether a decision is binding.  *Id.* at 1052.  The Ninth Circuit squarely held that "a published decision of this court constitutes binding authority" as soon as it is issued, and district courts within the Circuit must follow it unless and until "it is withdrawn by the court."  *Id. Zermeno-Gomez* thus makes clear that *Duarte* is binding and cannot be ignored simply because the mandate has not issued while the government seeks further review.

### b.    *Duarte*'s Application Of *Miller* Is Controlling

*Duarte* also cannot be disregarded simply because it applied *Miller* to hold that a prior panel decision (*Vongxay*) had been abrogated.  *Miller* holds that a Ninth Circuit panel may overrule a prior panel when "the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority."  *Miller*, 335 F.3d at 893.  *Duarte* applied *Miller*, and held that, under its rule, *Vongxay* was "irreconcilable" with *Bruen*, because "*Vongxay* did not follow the textually

Gibson, Dunn & Crutcher LLP

and historically focused 'mode of analysis' that *Bruen* established and required courts now to apply to all Second Amendment challenges." *Duarte*, 101 F.4th at 665. This decision was correct—*Vongxay* indisputably did not apply the history-and-tradition test required by *Bruen*. *See Vongxay*, 594 F.3d at 1115–18.

Moreover, *Duarte* is binding on all district courts in the Ninth Circuit, regardless of whether reasonable jurists might disagree with *Duarte*'s application of the *Miller* rule to overrule *Vongxay*. While district courts may have a different view of how the *Duarte* court should have applied the *Miller* rule, that does not support declining to follow *Duarte*'s published authority. "A district judge may not respectfully (or disrespectfully) disagree with his learned colleagues on his own court of appeals who have ruled on a controlling legal issue …." *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001). Indeed, if a district court could decline to follow a Ninth Circuit panel's application of *Miller* in a published opinion, then *Miller* would be meaningless.

*Duarte* is binding, unless and until it is vacated or overruled, and must be followed here.

## 2.    The Government Should Not Be Rewarded For Ignoring *Duarte*

Because *Duarte* is binding, it must be followed—and dismissal should be granted for that reason alone. *See Zermeno-Gomez*, 868 F.3d at 1052 (district courts are required to follow published Ninth Circuit opinions as soon as they are published). But dismissal is especially appropriate in this case, because the government charged Mr. Wiederhorn under 922(g)(1) after *Duarte* made clear the charge was unconstitutional. The government should not be rewarded for ignoring binding law and charging a defendant without probable cause, merely because the government hopes that it could later overturn *Duarte*.

When *Duarte* was published, the government was obligated to review the case and ensure it was not charging defendants who were innocent under the law established by its holding—an "Assistant United States Attorney's instructions to the grand jury" must correctly state "the applicable law." *United States v. Peralta*, 763 F. Supp. 14, 19

19

(S.D.N.Y. 1991); *see also* U.S. Dep't of Just., Just. Manual § 9-27.300, https://tinyurl.com/mrxahxmu (prosecutor cannot pursue charges if "a charge is no longer readily provable or appropriate"). Here, however, the government went forward with charging Mr. Wiederhorn either without analyzing *Duarte* or in disregard of the decision. This is clear from the face of the indictment—*Duarte* squarely holds that "committing 'a[ny] crime punishable by imprisonment for a term exceeding one year'" is not sufficient to support a 922(g)(1) charge (*Duarte*, 101 F.4th at 690), yet the indictment alleges that Mr. Wiederhorn's two prior convictions are qualifying offenses under 922(g)(1) solely because they were crimes "punishable by a term of imprisonment exceeding one year" (ECF No. 1 at 2). After *Duarte* held that being convicted of a "felony" is not enough to support a 922(g)(1) charge, the government ignored that holding when charging Mr. Wiederhorn.

Having indicted Mr. Wiederhorn in contravention of *Duarte*, the government should not be excused from its error by being allowed to wait-and-see whether *Duarte* will be taken *en banc*. That is not how the law works, and it is not consistent with the government's obligation to ensure "that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). The government's position is the equivalent of charging a defendant prospectively based on *pending* criminal legislation, rather than waiting to see if Congress actually passes the bill and the President signs it into law. Simply put, a published decision from the Ninth Circuit "must be followed unless and until it is overruled"—and while the government is free to seek to overrule a decision it disagrees with, it cannot ignore it. *Zermeno-Go*mez, 868 F.3d at 1053.

## V.    CONCLUSION

"[T]he right to keep and bear arms" is "every citizen's fundamental right." *Duarte*, 101 F.4th at 662. And the government cannot strip a citizen of that right unless it "demonstrat[es] that permanently depriving [the defendant] of this fundamental right is otherwise consistent with our Nation's history." *Id.* at 691. The government has not and cannot do that, so its indictment must be dismissed.

Gibson, Dunn & Crutcher LLP

DATED: July 9, 2024                        Respectfully submitted,

                                           GIBSON, DUNN & CRUTCHER LLP


                                           By: */s/ Douglas Fuchs*
                                              Douglas Fuchs

                                           *Attorney for Defendant Andrew A.*
                                           *Wiederhorn*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS INDICTMENT

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Andrew Wiederhorn, certifies that this brief contains 6,991 words, which complies with the word limit of L.R. 11-6.1.

DATED: July 9, 2024                    By: */s/ Douglas Fuchs*
                                            Douglas Fuchs

                                            *Attorney for Defendant Andrew A. Wiederhorn*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS INDICTMENT