# EXHIBIT 3

Exhibit 3 - Page 15

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                       FOR THE DISTRICT OF OREGON

 3    UNITED STATES OF AMERICA,        )
                                       )  Case No. CR-04-238-BR
 4              Plaintiff,             )
                                       )
 5    v.                               )  June 3, 2004
                                       )
 6    ANDREW ALAN WIEDERHORN,          )
                                       )
 7              Defendant.             )
      _____)  Portland, Oregon
 8

 9                      TRANSCRIPT OF PROCEEDING

10          (Change of Plea and Imposition of Sentence)

11        BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

12

13    APPEARANCES:
      FOR THE PLAINTIFF:       LANCE CALDWELL
14                             Assistant U.S. Attorney
                               U.S. Attorney's Office
15                             1000 S.W. Third Avenue
                               Portland, OR  97204
16                             (503)727-1000

17    FOR THE DEFENDANT:       MARC BLACKMAN
                               Ransom Blackman, LLP
18                             1400 - 1001 S.W. Fifth Avenue
                               Portland, OR  97204-1144
19                             (503)228-0487

20                             BRIAN O'NEILL
                               Jones Day
21                             555 West Fifth Street, Suite 4600
                               Los Angeles, CA  90013
22

23    COURT REPORTER:          AMANDA M. LeGORE, RDR, FCRR, CRR, CE
                               U.S. Courthouse
24                             1000 S.W. Third Avenue, Rm. 301
                               Portland, OR  97204
25                             (503)326-8184
```

Exhibit 3 - Page 16

1                    (Thursday, June 3, 2004; 1:30 p.m.)

2

3                      P R O C E E D I N G S

4

5           MR. CALDWELL:  Good afternoon, your Honor.  Lance

6    Caldwell for the Government.

7           This is CR-04-238, your Honor, United States versus

8    Andrew Alan Wiederhorn.  Mr. Wiederhorn is present, represented

9    by Marc Blackman and Brian O'Neill.

10          This is the time set for your Honor's consideration of

11   a petition for plea of guilty.

12          THE COURT:  Mr. Blackman?

13          MR. BLACKMAN:  Your Honor, before we get to the real

14   matters for today, I would like to introduce Brian O'Neill,

15   from the Jones Day law firm in Los Angeles.  We have filed a

16   motion to admit him pro hac vice for this case.

17          And I would ask -- I would move at this time for his

18   admission.  I have known Mr. O'Neill for longer than either of

19   us would like to admit, and I can attest to his fitness to

20   practice before this Court.

21          THE COURT:  I've seen the materials.  I've signed the

22   motion.

23          MR. O'NEILL:  Thank you, your Honor.

24          THE COURT:  Welcome, sir.

25          MR. BLACKMAN:  Thank you.

Exhibit 3 - Page 17

Page 3

1          THE COURT:  Mr. Blackman, you have a Waiver of

2     Indictment, and other materials?

3          MR. BLACKMAN:  We do, your Honor.

4          Did you want to go over the waiver with

5     Mr. Wiederhorn, or we can simply -- we have gone over it with

6     him.  He understands his right --

7          THE COURT:  Why don't you do what you need to do with

8     him to sign the document, and then I'll address it in the

9     context of all of the other papers that are before me.

10          MR. BLACKMAN:  Your Honor, Mr. Wiederhorn and I have

11     both signed the waiver, and I would tender it to the clerk.

12          THE COURT:  Okay.  Thank you.

13          Mr. Blackman, does Mr. Wiederhorn acknowledge receipt

14     of the Information Mr. Caldwell filed today in the case now

15     titled United States of America versus Andrew Alan Wiederhorn,

16     No. 04-238?

17          MR. BLACKMAN:  He does, your Honor.

18          THE COURT:  All right.  So you have a complete copy of

19     that there?

20          MR. BLACKMAN:  We do.

21          THE COURT:  Mr. Wiederhorn, sir, good afternoon.

22          THE DEFENDANT:  Good afternoon.

23          THE COURT:  I have a number of papers I understand

24     you've signed.  And in order for me to proceed with what you've

25     agreed to do today, I need to speak with you at some length

Exhibit 3 - Page 18

1   about these matters.

2           My purpose is to assure, first, that you understand in

3   fact all of these important documents.  And that, ultimately,

4   what I understand is an agreement you've reached with the

5   Government is in fact your own voluntary decision to endorse.

6   I understand that pursuant to that agreement, you intend --

7   subject to this entire process this afternoon -- to plead

8   guilty to two felony charges which the Government has brought

9   against you in this Information.  And I need to cover with you,

10  then, the terms of that plea agreement, your Petition to Enter

11  Plea of Guilty to those two charges, your Waiver of Indictment.

12  And then the particular way your plea agreement has been

13  tendered to the Court, which is under the Rule 11(c)(1)(C),

14  which is a rule that allows you to submit a proposed agreement

15  as to which the Government has affirmed its intentions, but

16  which would allow you to withdraw any guilty pleas if the Court

17  did not accept your plea agreement in its entirety.

18          So I'm going to be covering all of these materials

19  with you, as I say, at some length.

20          I will need you to be answering my questions under

21  oath.

22          Do you know what it means to take an oath, to testify

23  truthfully in Court?

24          THE DEFENDANT:  Yes, I do, your Honor.

25          THE COURT:  If you take the oath and then lie to me

Exhibit 3 - Page 19

1   about some important matter, that is an entirely new issue, a

2   new crime for which you could be prosecuted.  Your statements

3   are being taken down.  The oath is in fact an exceedingly

4   important step in this process.

5          Do you understand that?

6          THE DEFENDANT:  Yes, I do, your Honor.

7          THE COURT:  Are you willing to answer my questions

8   under oath?

9          THE DEFENDANT:  Yes, I am.

10          THE COURT:  Please raise your right hand.

11          (Witness sworn.)

12          THE DEFENDANT:  Yes, I do.

13          THE CLERK:  Thank you.

14          Please tell me your full name.

15          THE DEFENDANT:  Andrew Alan Wiederhorn.

16          THE COURT:  And, sir, are you the person of that name

17   who has been identified as the defendant in this Information I

18   referenced, which Mr. Caldwell filed?

19          THE DEFENDANT:  Yes, I am.

20          THE COURT:  I have here a document called Waiver of

21   Indictment.

22          Do you have a copy of it?

23          MR. BLACKMAN:  We do, your Honor.

24          THE COURT:  Mr. Wiederhorn, it says, in effect, that

25   you are waiving your right to grand jury indictment on the two

Exhibit 3 - Page 20

1   charges that the Government has brought against you.

2           The right to grand jury indictment is an exceedingly

3   important right.  It is incorporated in the Constitution.  And

4   the Government doesn't have the power to hail you into court

5   and expect you to answer felony charges unless the grand jury

6   determines there's probable cause to hold you accountable for

7   such a charge.

8           I don't have the power to be processing these charges

9   against you or to be engaging you in this kind of discussion

10  this afternoon unless a grand jury has brought charges and

11  determined there's probable cause.

12          So by signing this document, by waiving the Indictment

13  process through a grand jury, you've -- are very much giving

14  the Government the power to charge you in the manner in which

15  it did, and you're giving me your consent to process this

16  charge as though the grand jury had brought it.

17          In other words, two felony charges, now, are presented

18  to you, and no group of citizens has reviewed the evidence to

19  determine if they are charges supported by probable cause.

20          And you're agreeing that step can be bypassed.  And

21  you will act as though these charges were in fact brought in

22  the manner that otherwise is provided by law.

23          Do you understand that?

24          THE DEFENDANT:  Yes, I do, your Honor.

25          THE COURT:  Did you read this waiver?

Exhibit 3 - Page 21

1           THE DEFENDANT:  Yes, I did.

2           THE COURT:  Did you discuss it carefully with your

3    attorneys?

4           THE DEFENDANT:  Yes, I did, your Honor.

5           THE COURT:  All right.  And with respect to this

6    document and all of the other papers, which I understand you

7    have signed, I want to be sure first of all this afternoon that

8    you are thinking clearly.  Are you?

9           THE DEFENDANT:  Yes, I am, your Honor.

10          THE COURT:  Have you had any kind of medication,

11   intoxicant, anything at all in the past many hours that might

12   be affecting your thinking or your ability to make a good

13   decision?

14          THE DEFENDANT:  I don't think so, your Honor.

15          THE COURT:  Your Plea Petition indicates you take

16   certain medications:  Insulin, Axid, Flonase.  Are there any

17   other medications you may have taken in the last many hours?

18          THE DEFENDANT:  No, your Honor.

19          THE COURT:  Do any of these substances affect your

20   ability to think clearly?

21          THE DEFENDANT:  No, your Honor.

22          THE COURT:  Are you thinking clearly today?

23          THE DEFENDANT:  Yes, I am, your Honor.

24          THE COURT:  Did you sign this Waiver of Indictment?

25          THE DEFENDANT:  Yes, I did, your Honor.

Exhibit 3 - Page 22

1          THE COURT:  When you signed it, did you understand

2    what you were giving up?

3          THE DEFENDANT:  Yes, your Honor, I did.

4          THE COURT:  Is it your intention, then, to waive grand

5    jury indictment and to give the Government the permission I've

6    referenced, and indeed, then, to give the Court the authority

7    to proceed?

8          THE DEFENDANT:  Yes, it is, your Honor.

9          THE COURT:  I'm satisfied the defendant is making a

10   knowing, intelligent, and voluntary waiver of his right to

11   grand jury indictment, and I'm accepting that waiver.

12         All right.  So, Mr. Wiederhorn, the Information

13   charges you with two different felony crimes.  There are

14   additional important documents involving that Information.  One

15   is your Petition to Enter Plea of Guilty.  Another is a

16   document I'm going to call a plea agreement.

17         So I would like to direct your attention first to that

18   plea agreement document.  It's dated today, June 3.  It takes

19   the form of a letter from Mr. Caldwell, addressed to both

20   Mr. O'Neill and to Mr. Blackman.  And it sets out the terms of

21   a proposed settlement, if you will.  An agreement by which, if

22   you proceed, you will end up convicted of two felony crimes:

23   Giving illegally a gratuity, in violation of United States Code

24    Section 1954; and making a false statement knowingly, in

25   connection with a tax return.

Exhibit 3 - Page 23

1          Now, this agreement is formulated under the Rule

2    11(c)(1)(C).  And that rule allows, as I said earlier, the

3    parties to come to some agreement about how a criminal case can

4    be resolved and the actual terms of a judgment against a

5    defendant convicted on the basis of that agreement.  And,

6    actually, the rule contemplates a series of steps which

7    ordinarily would take place over time.

8          In your instance, you and the Government have

9    negotiated this agreement in advance.  You, through counsel,

10   informed the Court of your desire to present a plea agreement

11   under this rule.

12         You asked for and I granted the opportunity to have a

13   pre-plea, presentence investigation.  And it's my understanding

14   that if we do proceed today, it's your intention also to waive

15   your right to delay the imposition of sentencing.

16         And so in your particular instance, if things go the

17   way your lawyers have worked this with the Government, you will

18   be presenting this agreement, you will be entering guilty

19   pleas, and you will be sentenced pursuant to the plea agreement

20   and those pleas today.

21         Do you understand that?

22         THE DEFENDANT:  Yes, I do, your Honor.

23         THE COURT:  Now, in the ordinary course, under Rule

24   11(c)(1)(C), the parties would present the agreement.  Then

25   there would be a pause in the proceeding of days, sometimes

Exhibit 3 - Page 24

1    weeks, while the Court undertook this investigation to

2    determine what the proper application of the sentencing

3    guidelines might be, and to come to a decision about whether

4    the proposed agreement is something the Court would accept.

5           Indeed, Rule 11 gives the Court three options:  To

6    accept the agreement in its entirety, in which case the

7    defendant is sentenced exactly as the parties have agreed; to

8    reject the agreement, in which case we go back to where you

9    were before the agreement was tendered, which is to say,

10   nowhere in the sense that the Government only filed this case

11   because of an agreement; and the Court's third option is to say

12   I reject the agreement in the form presented, because there are

13   changes that I would require in order to impose judgment.

14          In your case, the form of the agreement was reviewed

15   with me yesterday after -- yesterday afternoon with your

16   attorneys.  I expressed concern about two aspects of the

17   agreement.  Two or three, depending on how you count.

18          I explained to your attorneys that I was not willing

19   to accept the agreement in the exact form tendered, but I

20   expressed my assessment that if there were certain changes

21   made, I would accept the plea agreement.

22          So what you've tendered -- Mr. Blackman, tell me, did

23   the parties change the agreement in any way to address my

24   concerns?  Or are we proceeding as though I'm going to reject

25   the agreement, and express to Mr. Wiederhorn what it is that I

Exhibit 3 - Page 25

1   would impose, and then he will have the opportunity to allow

2   his pleas to stand?  Tell me how that is intended by you and --

3        MR. BLACKMAN:  We did not change the agreement between

4   the parties, your Honor, except to the extent that there was a

5   reference to an anticipated time between entry of plea and

6   sentencing.  That was removed, because we had agreed to

7   proceed, as you've described, today.

8        With respect to the matters in which you indicated to

9   counsel yesterday that you would deviate from our agreement, we

10  have conferred with Mr. Wiederhorn about those matters.  He

11  understands what the Court's plan would be, and he has

12  determined to go forward.

13       THE COURT:  All right.  So to comply with Rule

14  11(c)(1)(C), then, what I intend to do is to review the plea

15  agreement, take the defendant's plea.  Then express formally my

16  rejection of the plea agreement in the terms articulated.  But

17  I will have already explained to Mr. Wiederhorn the variations

18  that I would impose.  And then he will have the formal

19  opportunity to choose to stand by his guilty pleas or to

20  withdraw them.  It being his intention, as I take it then, to

21  stand by them and then, again, to proceed to sentencing today.

22  Is that all accurate?

23       MR. BLACKMAN:  Yes.

24       THE COURT:  All right.  So we should begin, then.

25       Mr. Wiederhorn, do you have in front of you the plea

Exhibit 3 - Page 26

Page 12

1     agreement?

2                 THE DEFENDANT:  Yes, your Honor, I do.

3                 THE COURT:  All right.  And at the very end of the

4     agreement is the statement, "I have read this agreement

5     carefully and reviewed every part of it with my attorney.  I

6     understand and voluntarily agree to every part of it, and

7     acknowledge my waiver of my right to appeal and to file

8     post-conviction motions."

9                 Then it appears you signed after that statement.

10                Is that your signature?

11                THE DEFENDANT:  Yes, your Honor, it is.

12                THE COURT:  When you signed this paper, was this

13    statement true?  That you had read every part of it, that you

14    had discussed it thoroughly, and that you were voluntarily

15    agreeing?

16                THE DEFENDANT:  Yes, your Honor.

17                THE COURT:  And one other point of clarification,

18    Mr. Blackman, with respect to the waiver of appeal, the way it

19    was -- is written in the plea agreement, it is conditioned upon

20    the Court accepting the 11(c)(1)(C) tender.

21                And as I've indicated, there are -- is not going to be

22    an acceptance in the express terms.  What I need to understand

23    is whether it is Mr. Wiederhorn's intention, nonetheless, to

24    waive his rights to appeal and to Section 2255 relief, so long

25    as he is sentenced consistently with the modifications that

Exhibit 3 - Page 27

1    I've proposed.

2            MR. BLACKMAN:  That's correct, your Honor.

3            Paragraph 15 of the plea agreement remains as it

4    stated, and his decision to go forward is with the

5    understanding that the provision of that -- that part of the

6    agreement remains in full force and effect.

7            THE COURT:  All right.  Very good.

8            So we've effectively covered paragraph 1 of your plea

9    agreement, Mr. Wiederhorn.

10           Paragraph 2 lays out who the parties are to the

11   agreement:  You and the United States Attorneys' office for the

12   District of Oregon.  Explicitly, this agreement does not bind

13   any other federal, state, or local prosecuting administrative

14   or regulatory authority.

15           Do you understand?

16           THE DEFENDANT:  Yes, your Honor.

17           THE COURT:  So if any of those other entities had an

18   interest in you, arising out of these matters, the United

19   States Attorney for the District of Oregon does not have

20   authority and is not binding these other entities and agencies

21   under this agreement.

22           Do you understand?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  Nonetheless, in the -- what's described

25   here as an unlikely event that any other authority seeks to

Exhibit 3 - Page 28

1    bring criminal charges against you arising out of the subject

2    of this investigation, the United States Attorney's office for

3    the District of Oregon will urge that authority to defer to the

4    terms of this agreement.  And by that, I think this means the

5    United States Attorney's office will advocate on your behalf

6    that no other prosecutory action should be taken against you in

7    light of the disposition under this agreement.

8            Is that right, Mr. Caldwell?

9            MR. CALDWELL:  That's correct, your Honor.

10           THE COURT:  Do you understand?

11           THE DEFENDANT:  Yes, I do.

12           THE COURT:  Nonetheless, Mr. Caldwell, as persuasive

13   as he may be, does not have the power to bind any of these

14   other entities.  And so you are at risk, in that sense, that he

15   cannot control what decisions might be made by these other

16   entities.

17           Do you understand?

18           THE DEFENDANT:  Yes, your Honor.

19           THE COURT:  You would not be free to take back your

20   guilty pleas or to be relieved of your burdens under this

21   agreement, if such occurred.

22           Do you understand?

23           THE DEFENDANT:  Yes.  Yes, your Honor.

24           THE COURT:  All right.  Paragraph 3 lays out your

25   agreement to waive Indictment.  You've performed that.

Exhibit 3 - Page 29

1    It lays out your agreement to plead guilty on or

2    before today -- and we're in the process of doing that -- to

3    the Information charging you with one count of unlawful payment

4    of a gratuity, in violation of 18 United States Code Section

5    1954, and one count charging you with filing a false tax

6    return, in violation of 26 United States Code Section 7206, sub

7    1.

8    So before we get into the details of those charges,

9    have you in fact read the charges as laid out in the

10   Information, line by line, point by point?

11   THE DEFENDANT:  Yes, your Honor, I have.

12   THE COURT:  And are you familiar with the factual

13   assertions that underlie each of these charges?

14   THE DEFENDANT:  Yes, your Honor, I am.

15   THE COURT:  Each of these is a felony crime.  Each

16   carries with it a maximum penalty of three years in prison, a

17   maximum fine of 250,000 dollars, a period of supervision after

18   imprisonment of up to one year, and each carries a 100 dollar

19   statutory assessment.

20   Do you understand?

21   THE DEFENDANT:  Yes, your Honor.

22   THE COURT:  So any judge, anywhere in the United

23   States, sentencing anybody for violating these kinds of crimes,

24   would be facing the same upper limit to the judge's authority

25   to impose a criminal penalty.

Exhibit 3 - Page 30

1          Do you understand?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  With respect to the tax count, there is

4   also a requirement that the Court impose, as a -- an additional

5   penalty, the cost of the Government's prosecution.

6          In your instance, despite the fact that the Government

7   no doubt put considerable effort and expended resources in

8   investigating and then ultimately resolving the case against

9   you, the cost of prosecution is defined under law as that

10  occurring after a grand jury indictment.  And thus, by

11  definition, none occurred in your case, and there will be no

12  cost of prosecution assessed under the tax count.

13         Do you understand?

14         THE DEFENDANT:  Yes, your Honor, I do.

15         THE COURT:  The agreement indicates you will pay your

16  100 dollar assessments by the time of sentencing or explain to

17  the Court why you cannot do so.

18         Have you paid the 100 dollar assessments?

19         MR. BLACKMAN:  Technically, your Honor, we can't pay

20  it until the judgment is pronounced.  We do have the funds with

21  us, today, to pay as soon as there is a file that can receive

22  it.

23         THE COURT:  All right.

24         The next paragraph, 5, reflects the Government's

25  promise through the United States Attorney's office, not to

Exhibit 3 - Page 31

1    bring any additional charges against you in this district,

2    arising out of the Capital Consultants investigation; including

3    any information developed during the course of that

4    investigation and related investigations, or arising out of any

5    tax matters for tax periods preceding the date of this

6    agreement.

7             So you have bought peace, if you will, from the

8    Government.  It is promising not to prosecute you further in

9    any respect, in this district, arising from those matters.

10            Do you understand?

11            THE DEFENDANT:  Yes, your Honor, I do.

12            THE COURT:  All right.  The next paragraph speaks in

13   terms of what's called relevant conduct.  Relevant conduct is a

14   term of art.  It refers to not just the conduct technically

15   charged as a criminal act in the charging instrument, but it

16   refers to the broader course of conduct related to the criminal

17   act.  And on the basis of relevant conduct, then, the Court

18   must start the sentencing guidelines analysis.

19            In your case, with respect to the gratuity count, the

20   agreement provides that the Information will allege, as it

21   does, that on or about October 15, 1998, based on the return of

22   Jeffrey Grayson's personal guarantee, coincident with release

23   of a cash collateral account by Capital, to make the proceeds

24   available to Wilshire Credit Corporation, Wilshire Financial

25   Services Group, and the defendant.

Exhibit 3 - Page 32

1          The base offense level is 6.  The parties agree

2    relevant conduct based on the benefit to the payor, you,

3    pursuant to Guideline 1B1.3 and 2E5.1 is between 20 and 40

4    million dollars.  The parties' agreement produces a 16-level

5    increase in your base offense level.

6          Now, signing off on this document means you agree, as

7    a matter of fact, that the relevant conduct for this count

8    involves a benefit to you of between 20,000 and -- pardon me,

9    20 million and 40 million dollars.

10         Do you understand?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  Do you agree to that?

13         THE DEFENDANT:  Yes, your Honor, I do.

14         THE COURT:  That, of course, drives the calculation of

15   how -- by how much the base offense level should be increased

16   as an assessment of where the starting point is on a guidelines

17   computation, for purposes of a sentencing outcome here.

18         You understand that?

19         THE DEFENDANT:  Yes, your Honor.

20         THE COURT:  Have you spoken with your counsel about

21   how the sentencing guidelines work in general?

22         THE DEFENDANT:  In painful detail, your Honor.

23         THE COURT:  And have you gone through with them

24   thoroughly the application of the guidelines as reflected in

25   your agreement, insofar as your conduct is concerned and your

Exhibit 3 - Page 33

1    potential criminal exposure, based on these rules?

2              THE DEFENDANT:  Yes, I have, your Honor.

3              THE COURT:  So do you believe you understand how the

4    guidelines will work in your case under this agreement?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  With respect to relevant conduct and the

7    tax count, the Information will allege, says your agreement --

8    and indeed it does -- that you overstated losses on Schedule D

9    of your 1998 tax return in connection with the sale of SFI

10   notes to Longpond.

11             What is SFI?

12             THE DEFENDANT:  SFI is an LLC, family-owned

13   partnership, which was part of our estate planning to buy

14   Wilshire financial stock --

15             THE COURT:  And who was or who is Longpond?

16             THE DEFENDANT:  Longpond is a company which makes

17   investments owned by family members.

18             THE COURT:  So the tax charge alleges that you

19   overstated losses on Schedule D of your '98 returns in

20   connection with the sale of SFI notes to Longpond.

21             You know what that refers to, yes?

22             THE DEFENDANT:  Yes, I do.

23             THE COURT:  The plea agreement also specifies that the

24   Government believes this transaction did not result in any tax

25   loss, for sentencing guidelines purposes, in the proceeding.

Exhibit 3 - Page 34

1   And you're acknowledging here that you have had an opportunity

2   to analyze and confirm the Government's conclusion that there

3   is not any tax loss arising from this count, for purposes of

4   the guidelines.

5          THE DEFENDANT:  Yes, your Honor, I understand.

6          THE COURT:  That, of course, is different from any

7   calculation the Internal Revenue Service might make or

8   otherwise determine with respect to your tax liabilities, past

9   and future.

10         Do you understand?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  So because the Government says there's no

13  actual tax loss, there is a zero loss for purposes of the

14  guidelines, and thus, a Base Offense Level of 6 would apply for

15  this charge.

16         THE DEFENDANT:  Yes, your Honor.

17         THE COURT:  Right?  Okay.

18         And then the guidelines call for what's known as a

19  multiple-count adjustment when a person is being sentenced at

20  the same time for more than one count, as is contemplated in

21  your case.

22         And here you all are agreeing that under Guideline

23  3D1.4, because the offense level for the tax group is more than

24  9 levels less than the offense level for the gratuity group,

25  there would be no increase, and so we end up with an adjusted

Exhibit 3 - Page 35

1    offense level of 22 under the guidelines.

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  That is your agreement?

4              THE DEFENDANT:  Yes, your Honor, it is.

5              THE COURT:  And I should note that as I indicated at

6    the beginning of the proceeding, I've had the benefit of and

7    have before me a sentencing -- a presentence report, which is

8    in fact a pre-plea presentence report, which in fact tracks

9    these guideline assessments.  So the Court's Probation

10   Department endorses the guidelines analysis that -- that is

11   reflected in the parties' plea agreement.  And the Court

12   ultimately will do the same, as we get through this.

13             So Paragraph 7, the Government is promising to

14   recommend a three-level reduction off offense Level 22 because

15   you're accepting responsibility.  The three levels amounts to

16   two levels under one rule, and one level under another.  But at

17   this guideline range, it's still 3.  And 22 minus 3 is still

18   19, and it leads to the same place.

19             You're accepting responsibility.  You get treated like

20   anyone else does who accepts responsibility at this level, and

21   you get three levels off, taking you to Level 19.

22             THE DEFENDANT:  Yes, I understand, your Honor.  Thank

23   you.

24             THE COURT:  All right.  Now, the next paragraph talks

25   about departures.  So I want to just address that subject with

Exhibit 3 - Page 36

1    you, first, in general.

2            The sentencing guidelines are written in a way that

3    expects most people will be sentenced within the guideline

4    range in most cases.  The Sentencing Commission, and then

5    indeed Congress, in accepting the guidelines have considered

6    many factors in determining the seriousness of particular

7    crimes and how criminal history relates to a person's criminal

8    behavior and how that person should be treated, comparing one

9    person to the other and to the next.  The goal being, of

10   course, that someone committing a crime in the District of

11   Oregon would be treated similarly as a person treating --

12   committing the same crime anywhere else in the United States,

13   and the same kinds of factors would result in general

14   consistency in sentencing.

15           Nonetheless, even explicitly acknowledged in the

16   guidelines is the fact that ultimately a judge is sentencing an

17   individual.  This is not a bingo card.  This is not a

18   mathematical computation.  This is the exercise of judgment in

19   determining a proper sentence.

20           And there are factors that exist in a -- in an

21   individual person's circumstances, or with respect to a certain

22   crime, that can warrant a judge departing from guidelines.

23   Sometimes the departure is upward.  When there are factors that

24   are present of an aggravating nature, that a Judge concludes

25   are not adequately taken into account in the guidelines, a

Exhibit 3 - Page 37

1    judge has the authority and discretion to depart upward from

2    the guideline range, up to the maximum penalty.

3              Likewise, when there are mitigating factors that exist

4    of a kind or degree that are not adequately taken into account,

5    a judge has the authority to exercise discretion and to depart

6    out of the guideline box downward.

7              Whether to depart is always a decision left to the

8    discretion of the sentencing judge.  The parties cannot compel

9    a judge to do so.  And the closest you can come to is the

10   manner in which you've set this process in motion.

11             You can say, I'm pleading guilty on the condition that

12   this agreement is accepted.  And in your case, your agreement

13   calls for me to exercise discretion and depart downward four

14   levels on the basis of Guideline 5K2.0.

15             And in particular, relying upon a factual assertion

16   that you in fact relied extensively on professionals, including

17   accountants and attorneys.  And based on the advice of these

18   professionals, which does not amount to a legal defense to the

19   charge, you made decisions that has -- that have now put you in

20   the position that you are exposed to felony prosecution for

21   illegally giving a gratuity.

22             So the agreement you've reached with the Government --

23   and obviously the Government endorses this agreement by having

24   signed it -- is that this is a factor that does not otherwise

25   adequately appear in guidelines calculations.

Exhibit 3 - Page 38

1          And it does warrant a four-level downward departure.

2    Well, 19 minus 4 is 15.  At a guideline range 15, Criminal

3    History Category 1, which is the category where every first

4    offender is sentenced, the sentencing range is 18 to 24 months.

5          Now, again, normally a judge has authority to sentence

6    within a range.  At the low end, at the high end, in the

7    middle, wherever the judge determines the sentence is

8    warranted, based upon the exercise of discretion.  In your

9    case, you and the Government have agreed to an 18-month, which

10   is to say, a low-end sentence.

11         And I'll note that the presentence writer has endorsed

12   that recommendation.  If the Court grants the four-level

13   downward departure, the presentence writer also concurs that a

14   low-end sentence would be sufficient to accomplish all of the

15   statutory purposes of a sentence, specifically to punish, to

16   deter, and to address the seriousness of the behavior.

17         So paragraph 9 of your plea agreement then calls,

18   basically, for an 18-month prison sentence, after the Court

19   exercises discretion to depart downward four levels.

20         It also calls for the Government not to oppose any

21   request you would make to ask me to recommend that the Bureau

22   of Prisons designate you for your confinement to a prison camp,

23   and that that camp be as close to the District of Oregon as is

24   possible.

25         There is, of course, a camp at Sheridan.  It is,

Exhibit 3 - Page 39

1    however, up to the Bureau of Prisons to determine where you

2    will do your time; whether it will be in a camp or not, whether

3    it will be in a regular correctional facility.

4         These are matters beyond the Court's control, and you

5    will be subject to designation, like any other felony offender

6    who goes into the Federal Bureau of Prisons systems.  And the

7    Bureau of Prisons will be the entity that decides where in fact

8    you will do your prison time, if you proceed.

9         Do you understand?

10        THE DEFENDANT:  Yes, your Honor.  I do.

11        THE COURT:  All right.  In Paragraph 11 -- and this

12   was one area where I took issue with the parties' agreement.

13   There was a provision that the Government agreed for you to be

14   released on your own recognizance without any travel

15   restrictions, pending your voluntary surrender for service of

16   the custody portion of your sentence.

17        What I indicated to your attorneys yesterday afternoon

18   was that I would not accept your plea agreement written as

19   such, with this paragraph.

20        I would, however, require you to surrender your

21   passport, so that you would not be able to travel out of the

22   United States without -- obviously without a passport.

23        And that if you wished to travel out of the United

24   States pending your surrender, you would first have to make a

25   request to the Court's Pretrial Services officer.  And obtain

Exhibit 3 - Page 40

1    permission of that officer, and then my permission.  That is to

2    say, you would have to have a reason that would warrant

3    authorizing the travel.

4          I would not intend to authorize that kind of travel

5    for a vacation, or some such purpose.  Because, obviously, if

6    you do proceed this afternoon, you won't leave this

7    courtroom -- although at the moment presumed to be innocent,

8    you will leave a convicted felon.  And it's just not wise, in

9    my judgment, to permit a person in that status to travel at

10   will around the worlds.  I was not willing to endorse a

11   without-travel-restrictions condition, and I would give to the

12   pretrial release officer the authority to authorize your travel

13   outside the state of Oregon, based upon legitimate business

14   needs or other legitimate need to travel.  Again, not for

15   non-necessary reasons.

16         Do you understand?

17         THE DEFENDANT:  Yes, your Honor.

18         THE COURT:  Okay.  So that's one place where if you

19   were not willing to abide by my adjustments, we would not be

20   able to proceed.

21         Do you understand?

22         THE DEFENDANT:  Yes, your Honor, I do.

23         THE COURT:  Okay.  There also was a recommendation in

24   the pre-plea presentence report for the imposition of a fine of

25   25,000 dollars.  Your plea agreement is silent on that issue.

Exhibit 3 - Page 41

Page 27

1          I conclude that it's an appropriate sanction, in

2    addition to other matters that are reflected in your agreement.

3    And I would not accept your pleas, based on this agreement, if

4    it did not include a disposition that also included the

5    recommended 25,000 dollar fine.

6          THE DEFENDANT:  Yes, your Honor.  I understand that.

7          THE COURT:  So the Government, in Paragraph 12, agrees

8    it's not going to ask for any upward departures or adjustments.

9    And you agree you won't ask for any other downward departures

10   or adjustments beyond what we've covered, what is specified in

11   the agreement.

12          Do you understand?

13          THE DEFENDANT:  Yes, your Honor.

14          THE COURT:  Paragraph 13 provides for you to pay --

15   for me to order and for you to pay 2 million dollars

16   restitution to the Capital Consultants receiver.  And to do so

17   effectively, simultaneously with these proceedings concluding.

18          In other words, I understand you have made those funds

19   available to your attorney.  Your attorney is in the position

20   to issue the necessary check, assuming these proceedings go

21   forward.

22          And so part of your agreement with the Government is

23   to pay 2 million dollars restitution.  And that will happen,

24   you need to understand, if your proceeding goes forth.

25          Do you understand?

Exhibit 3 - Page 42

1        THE DEFENDANT:  Your Honor, I do.  And we have a check

2   here today.

3        THE COURT:  All right.  As part of the plea agreement,

4   Paragraph 14 provides that the Government will not bring any

5   civil or criminal forfeiture action against you, or against any

6   of your property, or property in which you or members of your

7   family have an interest.

8        In other words, this 2 million dollar restitution

9   payment, the Government is recommending the Court accept that

10  in lieu of any other efforts that would have to be undertaken

11  at whatever expense to recover whatever losses might be

12  attributable to your conduct.

13       THE DEFENDANT:  Yes, your Honor.

14       THE COURT:  Now, I understand, Mr. Caldwell -- and

15  this might be a good place for you to express for the record

16  the Government's reasoning in support of this particular figure

17  for restitution, as opposed to any other figure.  And here I'm

18  assuming there are a number of uncertainties with respect to

19  the nature and extent of the actual losses that could be

20  attributed personally to Mr. Wiederhorn and which could be

21  collected from him after an adversary criminal proceeding, on

22  whatever basis.

23       MR. CALDWELL:  That's right, your Honor.  And pursuant

24  to Title 18, we're assessing the appropriate measure of

25  restitution would unduly complicate the proceedings.  We

Exhibit 3 - Page 43

1   believe the Court has the authority to accept the agreement of

2   the parties for the restitution amount proposed.

3          In addition, as the Court knows, there has been

4   extensive civil litigation, which has resulted in a civil

5   settlement that's being administered by the CCI receiver.  And

6   that's why we ask that these funds be paid to the receiver.

7          THE COURT:  All right.  So, Mr. Wiederhorn, you are

8   not disputing, then, this 2 million dollar figure.  And you've

9   indicated you are prepared to pay that, should these

10  proceedings conclude according to your agreement?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  Now, Paragraph 15, waiver of your right to

13  appeal and your right to bring a habeas corpus case, the latter

14  of which is a limited waiver.  So let me talk about these

15  separately.

16         This waiver, as I interpret it -- and as Mr. Blackman

17  confirmed, effectively means that if we conclude these

18  proceedings today, as has been projected, today will be your

19  last day in court.  Your first and last day in court on these

20  charges.  There will be no review by a higher court.  You will

21  have no opportunity to ask the Ninth Circuit Court of Appeals

22  to reconsider or to in any way change the fact that you will

23  end up with two felony convictions.  You will end up with a

24  sentence of 18 months imprisonment.  You will end up paying 2

25  million dollars in restitution.  There will be no review of

Exhibit 3 - Page 44

1    that, if you proceed today.

2            Do you understand?

3            THE DEFENDANT:  Yes, your Honor.

4            THE COURT:  The waiver also includes your waiver to

5    bring a so-called 2255 proceeding or a habeas corpus

6    proceeding.

7            People who are in federal custody have a right

8    originally and guaranteed in the constitution -- and now, by

9    statute -- to bring an action for release if they contend their

10   physical detention is the product of some violation of a

11   federal right, a constitutional or statutory right.  This

12   happens, frankly, quite frequently.

13           Prisoners, doing their time, bring a civil action.

14   Complain that there was some problem in the way they got

15   convicted, or that the judge got it wrong, or something has

16   tainted the fact that a judgment entered, requiring them to

17   serve prison time.  And these proceedings are very, very

18   frequently brought.

19           You're giving up the right to bring such a proceeding,

20   except in three particular instances, and I want to review

21   them.

22           The first is on the basis of ineffective assistance of

23   counsel.  You have a constitutional right, under the Sixth

24   Amendment, to effective assistance of counsel.  But that

25   doesn't really mean what it says.  What the Constitution

Exhibit 3 - Page 45

1  guarantees is a floor.  A minimum standard of competence by

2  lawyers representing people in criminal proceedings.

3       I daresay that the lawyers who are representing you

4  are far above a minimum standard, when one looks at their

5  experience collectively, the kind of work they do routinely in

6  this court.  And though I'm not familiar with your newest

7  admission, I understand, through the voucher by Mr. Blackman,

8  he's to be included in that assessment.

9       So you could try to bring a habeas case, based on

10  ineffective assistance of counsel.  But you would have to show

11  that the advice you received from your criminal lawyers, here,

12  fell below that minimum threshold so much so that, effectively,

13  you had no lawyer at all.  That's the standard.

14       It's a very daunting one, and it just is highly

15  unlikely for me to think you could make such a case.

16       But I want you to know you've reserved the right to do

17  it.

18       Do you understand?

19       THE DEFENDANT:  Yes, your Honor, I do.

20       THE COURT:  Now, have you been completely honest in

21  your disclosures to your attorneys?

22       Have you told them everything you can think of that

23  would put them in a position to give you competent advice and

24  to assist you in making a resolution here?

25       THE DEFENDANT:  Yes, your Honor, I have.

Exhibit 3 - Page 46

1          THE COURT:  Have you had enough time with your

2    attorneys to consider all of these matters?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Have you asked all the questions you want

5    to ask?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Have they been responsive to all of your

8    concerns?

9          THE DEFENDANT:  Yes, your Honor.

10         THE COURT:  Are you in fact satisfied with the advice

11   and services of your attorneys?

12         THE DEFENDANT:  Yes, I am, your Honor.

13         THE COURT:  You've also reserved the right to bring a

14   habeas case in the event of newly discovered evidence.

15         All right.  This process, this criminal investigatory

16   process has been ongoing for years.  And you have been at the

17   heart of it, through counsel in the background.  You've been

18   aware that there has been a lot of effort undertaken here.

19   Yes?

20         THE DEFENDANT:  Yes, your Honor.

21         THE COURT:  And you, I assume, through your own

22   resources, with your own counsel, have tried -- have tried to

23   uncover every piece of evidence that you could find that might

24   be helpful in the event you were prosecuted.

25         THE DEFENDANT:  Yes, your Honor.

Exhibit 3 - Page 47

1            THE COURT:  So the likelihood of there being newly

2    discovered evidence, meaning something that's out there, that

3    you don't know about today, I'm going to guess, is pretty

4    small.  But, nonetheless, you've reserved the right to bring a

5    habeas case based on that ground.

6            Do you understand?

7            THE DEFENDANT:  Yes, your Honor, I do.

8            THE COURT:  You would have to show, however, if you

9    brought such a habeas case on that ground, that the evidence

10   truly is new and could not have been discovered in the exercise

11   of due diligence up to this point.

12           Do you understand?

13           THE DEFENDANT:  Yes, your Honor.

14           THE COURT:  You have in fact been duly diligent in

15   searching for evidence up till now?

16           THE DEFENDANT:  Yes, your Honor.

17           THE COURT:  All right.  The last ground is a

18   retroactive change in the law or the guidelines.  So if, today,

19   I sentence you based upon your agreements and these guidelines

20   calculations, and tomorrow or next week or while you're doing

21   this 18 months, the law changes and the base offense level for

22   one of these crimes drops significantly, such that the

23   calculation would change, you would have a right to bring a

24   habeas case if that change in law was made retroactive.

25           Okay?

Exhibit 3 - Page 48

Page 34

1         THE DEFENDANT:  Yes, your Honor.

2         THE COURT:  That's also not a likely thing to happen.

3    I just want you to understand you've reserved three particular

4    grounds, none of which I see as particularly likely to provide

5    you any relief.

6         And so were I in your shoes, I would assume that there

7    is an 18-month sentence waiting, and that nothing's going to

8    change it.

9         Your appeal rights don't exist, and there really isn't

10   any viable opportunity to change it by a habeas case later.

11        THE DEFENDANT:  Yes, your Honor.

12        THE COURT:  Do you understand?

13        All right.  All right.  You've signed other papers.

14   We're going to get to those in a minute.  But your plea

15   agreement in Paragraph 19 makes the point that this letter

16   states the full and complete agreement between the parties.

17   There are no other promises or agreements, express or implied.

18   And after signing the original of this letter, it's going to be

19   part of your petition.

20        THE DEFENDANT:  Yes, your Honor.

21        THE COURT:  Are there any other promises or conditions

22   that have motivated you to plead guilty, as I expect you will,

23   other than what's written in this plea agreement and in your

24   Plea Petition?

25        THE DEFENDANT:  No, your Honor.

Exhibit 3 - Page 49

Page 35

1        THE COURT:  And other than what I've told you are the

2   explicit modifications of the plea agreement, is there any

3   other expectation that you have, other than what's been written

4   down here?

5        THE DEFENDANT:  No, your Honor.

6        THE COURT:  Has anyone made any unwritten promise, any

7   inducement to you, anything at all to persuade you to resolve

8   the case this way, other than as has been written in this

9   paper?

10        THE DEFENDANT:  No, your Honor.

11        THE COURT:  All right.  And you've told me, then, that

12   that is your signature, so now we can move on to your petition.

13        And it tells me that you are 38 years old, and you

14   have education up through and including college graduation.

15        Is that true?

16        THE DEFENDANT:  Yes, your Honor, it is.

17        THE COURT:  It tells me you've received a copy of the

18   Information.  That's true?

19        THE DEFENDANT:  Yes, your Honor.

20        THE COURT:  It tells me you have read the Information,

21   you have been counseled by your attorneys, and you understand

22   the nature of the charges and any lesser included offenses and

23   any possible offenses you might have.

24        THE DEFENDANT:  Yes, your Honor.

25        THE COURT:  It lays out at the bottom of page 2 the

Exhibit 3 - Page 50

Page 36

1    elements of the charge, which we'll repeat in a while.  And

2    then at the top of page 3, the elements of the second count.

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  Do you understand that the Government has

5    the burden to prove each element of such a crime beyond any

6    reasonable doubt in a jury trial, convincing 12 citizens that

7    all elements are proven, before someone can be proven guilty in

8    the ordinary course?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  All right.  Paragraph 6 confirms your

11   answers to me earlier that you're not now under the influence

12   of alcohol or drugs, not suffering from any injury, illness or

13   disability that affects your thinking.  And other than the

14   drugs indicated, you've not taken medications.

15             That's all true, yes?

16             THE DEFENDANT:  Yes, your Honor.  That's all true.

17             THE COURT:  All right.  Paragraph 7, top of page 4,

18   consequences of having a felony conviction.

19             Well, we've covered a lot of those consequences in the

20   context of criminal penalties.  But you need to understand that

21   there are other consequences that may apply to you.  For

22   example -- well, Paragraph A does not apply, because I

23   understand you are in fact a citizen of the United States.

24             THE DEFENDANT:  Yes, your Honor.

25             THE COURT:  Paragraph B does not apply, because that

Exhibit 3 - Page 51

1    normally involves drug convictions with certain other factors.

2              Paragraph C, however, may apply to you.  A person with

3    a felony conviction suffers the loss of certain civil rights:

4    The right to vote, to hold public office, the right to receive

5    certain professional licenses.  In other words, if the State of

6    Oregon or if the United States, or some other governmental

7    agency needed to license you for you to engage in a certain

8    profession, a felony conviction could interfere with that.

9              THE DEFENDANT:  I understand.

10             THE COURT:  Do you understand?

11             Okay.  What -- how would you describe your current

12   profession?

13             THE DEFENDANT:  I'm an executive, your Honor, of a

14   company that makes investments in different businesses and real

15   estate.

16             THE COURT:  Have you considered whether having these

17   felony convictions might affect your ability to continue in

18   that chosen profession?

19             THE DEFENDANT:  Yes, I have, your Honor.

20             THE COURT:  Do you know the answer?

21             THE DEFENDANT:  I don't believe that it will adversely

22   affect my ability to continue.

23             THE COURT:  And if it does, do you understand you're

24   bearing that risk today?

25             THE DEFENDANT:  I do, your Honor.

Exhibit 3 - Page 52

Page 38

```
 1              THE COURT:  So nobody's promising you that that's
 2    going to continue.  And, in fact, if it turns out that people
 3    with whom you do business don't want to do business with you
 4    anymore -- anymore, or to allow you to do business personally
 5    with them because of these convictions, that's a consequence
 6    you will suffer.
 7              Do you understand?
 8              THE DEFENDANT:  I get it.  Yes, your Honor.
 9              THE COURT:  You won't be able to possess a firearm
10    under any circumstances.  Persons with felony convictions can't
11    possess a firearm.  It's a violation of federal law, and it's a
12    violation of state law.
13              Do you understand?
14              THE DEFENDANT:  Yes, your Honor.
15              THE COURT:  Do you own or possess any firearms
16    presently?
17              THE DEFENDANT:  Yes, your Honor.
18              THE COURT:  You will need to dispose of them
19    immediately.  And when these proceedings are concluded, you
20    will need to work with the Pretrial Services officer and the
21    marshal to assure that you are not even in constructive
22    possession of a firearm.
23              THE DEFENDANT:  Yes, your Honor.
24              THE COURT:  Do you understand?
25              All right.  Paragraph 8, your constitutional rights.
```

Exhibit 3 - Page 53

1   Let's take those carefully.

2           Mr. Wiederhorn, you stand before the Court presumed to

3   be innocent of any wrongdoing.  You are faced with an

4   Information that charges you with two felonies, but it is just

5   that right now, a charge.  Accusations on a piece of paper.

6   And as such, you remain presumed innocent.  There is no one

7   here today who has the power to change that, except you.

8           If the Government wanted to have you convicted over

9   your objection and without your plea of guilty, it would have

10  to prove you guilty in a public trial by jury.

11          I don't have the power to find you guilty today.  The

12  only way I can enter a judgment of conviction is if a jury

13  returns a guilty verdict or a person properly pleads guilty.

14          So you need to understand, as we start, that this

15  presumption of innocence is more than just talk.  It is

16  guaranteed by the Constitution.  And you have the power to

17  change everything right now.  If you said no, we would stop.

18          I don't know what the Government would do in response

19  to that, but I do know that no one here has the power to have

20  you found guilty today except you.  Do you understand?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  So if you did change your mind and if the

23  Government prosecuted you in the more traditional fashion, you

24  would have the right to a public trial by jury, where the

25  Government would have to prove you guilty beyond any reasonable

Exhibit 3 - Page 54

1   doubt.   The Government would have to convince 12 citizens,

2   every one of them, that every element of a charge against you

3   had been established to that standard.

4           Do you understand?

5           THE DEFENDANT:  Yes, I understand, your Honor.

6           THE COURT:  If even one juror did not accept the

7   Government's proof as reliable, you could not be found guilty.

8           Do you understand?

9           THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  And in a case that arises out of a morass

11  of financial transactions and documents and years and years of

12  dealings, who can say what a jury would do?  You need to

13  understand that you're giving up something here.

14          Do you?

15          THE DEFENDANT:  Yes, your Honor, I do.

16          THE COURT:  You're giving up any right, any chance --

17  however slight the chance might be -- that if your case went

18  the distance, a jury might not find you guilty.

19          Do you understand?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  On the other hand, you are also protecting

22  yourself from any risk that if your case was handled by the

23  Government through an Indictment and you were prosecuted for

24  charges -- perhaps even in addition to these -- that a jury

25  might find you guilty, and the outcome might be harsher.

Exhibit 3 - Page 55

1          Balancing.  You see?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  At a jury trial, you would have the right

4     to see, to hear, and to confront all of the witnesses against

5     you.  You would have the right to persist in a plea of not

6     guilty, the right to remain silent, the right not to offer any

7     evidence at all, and ultimately to expect that I would assure

8     the jury would understand you had those privileges.  And none

9     of them could infer from silence, or a lack of your producing

10    evidence, that you must be guilty.

11         Do you understand?

12         THE DEFENDANT:  Yes, your Honor.

13         THE COURT:  You would also have the right to testify,

14    if you chose.  And even if your lawyer said, you know, "This is

15    a bad idea.  Don't do this.  There are too many risks," it

16    still is you who's accused, and so you make the choice.  You

17    have the right to testify, if you chose.  Subject, of course,

18    to cross-examination by the Government.

19         Right?

20         THE DEFENDANT:  Yes, I understand that.

21         THE COURT:  You would have the right to use the

22    Court's subpoena power to compel witnesses to come to court to

23    testify if you thought they had something useful to say, they

24    didn't want to come on their own, and you wanted to have that

25    evidence before the jury.

Exhibit 3 - Page 56

Page 42

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  And ultimately, of course, you would have

3     the right to the effective assistance of counsel in that

4     process, too.

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  If you plead guilty, there will be no

7     trial.  There is no chance you will walk out of the courtroom

8     not guilty.  The case will be resolved on the terms that we've

9     discussed.

10          Do you understand?

11          THE DEFENDANT:  Yes, I understand.

12          THE COURT:  And a prison sentence will follow.

13          There isn't any Parole Board or Parole Commission or

14     authority that will release you early from prison or somehow

15     lift that burden.  It is what will happen.

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  You will have the right to earn good

18     conduct credit against any prison sentence, against this prison

19     sentence.  It is limited to a maximum of 54 days credit

20     available for every year actually served.  So you would have to

21     serve a whole year before you get any credit.  And then the

22     person who decides if you get the credit is the warden.  The

23     Bureau of Prisons decides.

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  Do you understand?

Exhibit 3 - Page 57

1           So we've talked about the prison consequence, the

2    restitution consequence, a fine in this instance.  None of the

3    reasons for imposition of a period of post-prison supervision

4    or supervised release, I should say, require the imposition of

5    that supervision, and so I've concurred with the

6    recommendations of the parties that that not be imposed.

7           And so we get to Paragraph 23 of your Plea Petition,

8    which says, basically, this is your decision, a voluntary one.

9    And I want to talk with you about that.

10          Have you given this decision considerable thought?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  Has anyone pressured you to plead guilty

13    when you do not want to?

14          THE DEFENDANT:  No, your Honor.

15          THE COURT:  Are you sure this is what you want to do?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  Have you obtained the advice of anyone and

18    everyone whose advice matters to you on this subject?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  Ultimately, have you made your own

21    personal, voluntary decision that this is what you want to do?

22          THE DEFENDANT:  Yes, I have, your Honor.

23          THE COURT:  Are you pleading guilty because in fact,

24    as we will establish with facts in a few minutes, you believe

25    you are guilty of each of these two charges?

Exhibit 3 - Page 58

Page 44

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  So on page 10 of your petition is the

3    statement, "Signed by me, in the presence of my attorneys,

4    after reading all of the foregoing pages and paragraphs."  And

5    it's dated today.  And, again, it looks like you signed that.

6          Did you?

7          THE DEFENDANT:  Yes, I did, your Honor.

8          THE COURT:  When you signed it, were you sure you

9    understood everything in the petition?

10         THE DEFENDANT:  Yes, I believe I did, your Honor.

11         THE COURT:  All right.  Just a couple more documents I

12   want to review with you.

13         I understand there are factual stipulations that the

14   parties have reached with respect to each of the counts.

15         Is that right?

16         MR. BLACKMAN:  Yes, your Honor.  It's my understanding

17   the Court has copies of those.

18         THE COURT:  I have copies.  I don't know where the

19   originals are.

20         Have they been signed?

21         MR. BLACKMAN:  Yes, and I have -- it was my

22   understanding that you had a set of originals.

23         I do have a set of originals which I intended for the

24   Court.

25         THE COURT:  I might have them.  But let me --

Exhibit 3 - Page 59

Page 45

1           MR. BLACKMAN:  These are actually signed before the

2     Information was filed this morning, so they don't bear the case

3     number.  But they are originals, signed by all of the parties.

4           THE COURT:  All right.  Well, let me look.  What I

5     have are all copies.  I will write the case numbers on the

6     originals.  I will trade you a set of copies, for the

7     originals.  All right?

8           So, Mr. Wiederhorn, would you please look at the

9     document titled "Stipulation regarding the Section 1954 count."

10          THE DEFENDANT:  I have it, your Honor.

11          THE COURT:  It is six pages, and what it sets out are

12    a series of factual assertions in 15 numbered paragraphs.

13          The effect of this document is to say you agree to the

14    truth of each one of these facts.

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Do you understand?  Have you read the

17    stipulation?

18          THE DEFENDANT:  Yes, I have, your Honor.

19          THE COURT:  Have you carefully reviewed it?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  Are you certain it is accurate?

22          THE DEFENDANT:  Yes, I am, your Honor.

23          THE COURT:  And at the end of it, on page 6, at the

24    top is the statement, "Agreed to this 1st day of June, 2004."

25    Mr. Caldwell signs.  And then it says, "For Andrew Wiederhorn."

Exhibit 3 - Page 60

Page 46

1    And then, again, it appears you've signed it.

2            THE DEFENDANT:  Yes, your Honor.

3            THE COURT:  Same questions with respect to the factual

4    stipulation concerning the tax count.  It is four pages long.

5            Did you read this carefully?

6            THE DEFENDANT:  Yes, I did, your Honor.

7            THE COURT:  Is every fact asserted here true and

8    accurate?

9            THE DEFENDANT:  Yes, it is, your Honor.

10           THE COURT:  And at the end, it says you've agreed to

11   this, and it looks like you've signed.

12           Is that your signature?

13           THE DEFENDANT:  Yes, your Honor.

14           THE COURT:  All right.  I don't intend to read each

15   one of these stipulations into the record.  They will be filed.

16   We'll cover the factual basis for the pleas in due course.

17           So, then, I'm going to read to you the charges in the

18   Information, Mr. Wiederhorn.  And then we will turn to

19   Mr. Caldwell, and he will review each of the charges

20   separately, reviewing the elements he would have to prove if

21   each charge went to trial, and giving the summary of the

22   evidence, which is a condensed version of these factual

23   stipulations you've signed.

24           When he's finished, you will need to tell me, in your

25   own words, what you did that makes you guilty of the crimes I'm

Exhibit 3 - Page 61

1   about to describe by reading -- I'm going to describe them by

2   reading them to you from the Information, so you can follow

3   along.

4          Count 1, payment of gratuities, introduction.

5               At relevant times, from 1989 through January

6               1999, Andrew Alan Wiederhorn was a principal owner

7               of and controlled Wilshire Credit Corporation.

8               From December 1996 through August 1999, Wiederhorn

9               was the chief executive officer of Wilshire

10              Financial Services Group, Inc., and an officer

11              and/or a director of its subsidiaries and

12              affiliated companies.

13              From 1968 through September 2000, Capital

14              Consultants, Inc., was a registered investment

15              advisor that provided investment management

16              services to clients, including employee retirement

17              benefit and welfare benefit plans, subject to Title

18              1 of the Employee Retirement Income Security Act of

19              1974, also known as ERISA.

20              Capital solicited, accepted, and exercised

21              control over investors' funds.  Jeffrey Grayson

22              controlled Capital and had a fiduciary duty to the

23              plans to avoid any action or interest that would

24              conflict with his duty to them.  Grayson had the

25              duty to consider and to take actions and make

Exhibit 3 - Page 62

1    decisions concerning questions and matters relating

2    to the management and investment of the plan funds.

3    He was ultimately responsible for the

4    identification of investment opportunities, the

5    allocation and investment of plan funds,

6    negotiation of terms of investments, and the

7    disclosure of information about investments to

8    plans and other investors.  He is a person covered

9    by the terms of 18 USC Section 1954.

10    Among other investments, Capital invested plan

11    and other investor funds in loans to a company

12    called "The Hand That Feeds You."

13    At Grayson's request, Wiederhorn authorized

14    the purchase of these loans from Capital by

15    Wilshire company, subject to certain conditions,

16    including Grayson's agreement to guarantee

17    repayment of the loans by a predetermined time with

18    interest.

19    On or about October 15, 1998, in the state and

20    District of Oregon, Wiederhorn, because of actions,

21    decisions, and other duties of Grayson, related to

22    questions and matters concerning the plans as set

23    forth in Paragraphs 3 through 5, including the

24    release to Wilshire Credit Corporation and Wilshire

25    Financial Services Group of approximately

Exhibit 3 - Page 63

1          25,300,000 dollars, directly and indirectly gave

2          Grayson a thing of value; to wit, the return and

3          release of Grayson's personal guarantee to repay or

4          repurchase the "The Hand That Feeds You" loans, on

5          which approximately 3,400,000 dollars remained

6          unpaid, all in violation of Title 18 United States

7          Code Section 1954.

8          Do you understand the charge in Count 1?

9          THE DEFENDANT:  Yes, your Honor.

10         THE COURT:  The charge in Count 2, filing a false tax

11    return.

12              On or about October 19, '99, in the state and

13         district of Oregon, Andrew Alan Wiederhorn did

14         knowingly and willfully file a United States joint

15         income tax return for the calendar year 1998, which

16         he did not believe to be true and correct as to

17         every material matter; to wit, the return

18         substantially overstated capital losses reported on

19         Schedule D as an offset to income.  All in

20         violation of Title 26, United States Code Section

21         7206, sub 1.

22         Do you understand the charge in Count 2?

23         THE DEFENDANT:  Yes, your Honor.

24         THE COURT:  All right.  Mr. Wiederhorn, you may have a

25    seat.

Exhibit 3 - Page 64

1                Mr. Caldwell, let's take them one charge at a time.

2                First, Count 1 and the elements and evidence summary.

3       And then we'll hear from Mr. Wiederhorn, and then we'll go with

4       Count 2.

5                MR. CALDWELL:  All right.  Your Honor, in order to

6       prove a violation of Section 1954, the Government has to prove

7       beyond a reasonable doubt the following elements.

8                That on or about the date alleged in the Indictment,

9       in the District of Oregon, the defendant directly or indirectly

10      gave or offered to give any loan, money, or thing of value to a

11      person covered by the terms of Section 1954 because of the

12      actions, decisions, or other duties relating to any question or

13      matter concerning such plans.

14               The Government believes it must prove that the action

15      or decision alleged was a substantial factor in the decision to

16      give the thing of value.

17               The evidence, briefly, your Honor, is during the

18      relevant period, the defendant controlled Wilshire Credit

19      Corporation and Wilshire Financial Services Group and related

20      companies.  Capital Consultants was in fact a registered

21      investment advisor, providing investment advice to investors,

22      including ERISA-covered plans.

23               CCI did solicit and accept and exercise control over

24      investors' funds.  Mr. Grayson controlled CCI and was a

25      fiduciary to the plan.  He had the duty to consider and take

Exhibit 3 - Page 65

1    actions and make decisions concerning questions and matters

2    relating to the management and investment of plan funds.

3            Between 1995 and October 1998, under Grayson's

4    direction, Capital Consultants made numerous loans of its

5    investors funds, including plan funds to Wilshire Credit.

6            The terms of these loans generally required that a

7    certain percentage of each loan -- typically about 15

8    percent -- be retained by the borrower in a cash collateral

9    account.

10           Beginning in about 1995 and continuing through January

11   '98, Mr. Wiederhorn facilitated Grayson's receipt of a line of

12   credit loan where it had to be known as CF Credit, and

13   including net borrowings totalling about 4.2 million dollars.

14   CF Credit sold these loans to Wilshire Funding Corporation, a

15   subsidiary of Wilshire Financial Services Group, in about March

16   1998.

17           In December of 1997, Grayson asked Mr. Wiederhorn to

18   have one or more of the Wilshire companies purchase the two

19   "Hand That Feeds You" loans.  These loans by Capital

20   Consultants were loans of investor funds.

21           At Grayson's request, Wiederhorn authorized the

22   purchase -- the purchase of these loans from Capital via a loan

23   from Capital, subject to certain conditions, including

24   Grayson's and CCI's agreement to guarantee repayment of the

25   loans by a predetermined time, with interest.

Exhibit 3 - Page 66

1          In January and February of 1998, Wilshire Funding

2    Corporation advanced funds for the purchase of these two loans

3    from Capital for the then outstanding balance of approximately

4    3.8 million dollars.

5          Wilshire Funding immediately transferred the loans to

6    Wilshire Credit Corporation.  Grayson and Capital signed the

7    requested guarantees.

8          In the summer of 1998, at Grayson's request, and with

9    the knowledge and approval of counsel for the parties,

10   Wiederhorn caused Wilshire Credit to release Capital from its

11   corporate guarantees in payment of the loans, leaving Grayson

12   as the sole guarantor.

13         During the fall of 1998, Wilshire Financial Services

14   Group and its subsidiaries and related companies suffered

15   financial problems and needed cash.

16         Mr. Wiederhorn requested and Capital agreed to loan

17   Wilshire Credit an additional 6 million dollars, and agreed to

18   release for the benefit of Wilshire Credit and Wilshire

19   Financial Services Group and related companies 19.3 million

20   dollars from the cash collateral accounts referred to before.

21         On or about October 15th, 1998, the date alleged in

22   the Indictment, Grayson demanded, as a condition of these loans

23   and cash collateral releases, that the guarantees given by

24   Grayson to repay the "The Hand That Feeds You" loans be

25   returned and released.

Exhibit 3 - Page 67

1              On October 15th, 1998, with Wiederhorn's consent and

2      with the knowledge of counsel for Wilshire Credit and Wilshire

3      Financial Services Group, these companies agreed to this

4      condition.

5              This was a thing of value to Grayson, because it

6      relieved him of his personal guarantee of a 3.4 million dollar

7      obligation.  Notwithstanding Mr. Grayson is legally incompetent

8      and unable to testify, the Government can prove that this

9      action was because of Grayson's actions in agreeing to loan the

10     additional 6 million dollars referred to, and release the 19.3

11     million dollars from the cash collateral account.

12             The Government believes it would prove that this was a

13     substantial factor in the defendant's decision to release

14     Grayson from the 3.4 million dollars in guarantees, which

15     release occurred in Portland on or about October 15th, 1998.

16             THE COURT:  All right.  Thank you, Mr. Caldwell.

17             Mr. Wiederhorn, the factual summary -- the long is

18     actually shorter than the stipulation you've signed.

19             Did you understand it?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  Do you disagree in any significant way

22     with Mr. Caldwell's rendition of the facts, as they've been

23     laid out?

24             (Pause, conferring.)

25             THE DEFENDANT:  No, your Honor.

Exhibit 3 - Page 68

1          MR. BLACKMAN:  The only question he had, in speaking,

2     Mr. Caldwell used the word "indictment."  And, of course, it's

3     an Information.  But --

4          THE COURT:  Exactly.

5          All right.  So the elements of a Section 1954 felony

6     charge are when a person commits the crime, when a person

7     illegally gives -- and that is to say, it is illegal when one

8     is motivated in the decision to give a thing of value to a

9     person like Jeffrey Grayson, controlled by the statute, if

10    there is a link between a decision, action, or duty of the

11    person in Grayson's shoes and the actual motive of the giver.

12    In this instance, you.

13         So for you to be found guilty of a Section 1954

14    violation for this transaction, it would have to be true that

15    you intended there to be a link between your decision to allow

16    Grayson to have back his guarantee and to release him from it

17    and his decision on behalf of Capital to then release cash,

18    which included money controlled by the plaintiff, to Wilshire

19    and its related entities, to help relieve the financial stress

20    of the time.

21         Do you understand?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  If you think you're guilty, then, of Count

24    1, tell me, please, in your words, what did you do that makes

25    you guilty.

Exhibit 3 - Page 69

1          THE DEFENDANT:  Your Honor, on October 15th of 1998,

2     Mr. Grayson and Capital Consultants demanded, as a condition of

3     making the new loan to Wilshire and the release of the cash

4     collateral account which was referred to a minute ago, that the

5     guarantees given by Mr. Grayson to repay "The Hand That Feeds

6     You" loans be returned and released.

7          And, your Honor, on that same date, I consented, as an

8     officer of Wilshire Financial Services Group and Wilshire

9     Credit Corporation, with the knowledge of my counsel, to that

10    condition.

11         THE COURT:  And did you explicitly intend, in giving

12    that thing of value -- that is to say, the release to Grayson,

13    did you intend, was there a linkage in your own mind between

14    that decision and Grayson's actions or decisions in releasing

15    plan funds for the benefit of the Wilshire entities?

16         THE DEFENDANT:  Yes, your Honor.

17         THE COURT:  All right.  You stand before the Court

18    presumed to be innocent of Count 1.

19         How do you plead to that charge?

20         THE DEFENDANT:  Guilty, your Honor.

21         THE COURT:  Thank you.  Please have a seat.

22         Count 2, factual basis and elements, please.

23         MR. CALDWELL:  Your Honor, the elements of the offense

24    of making and subscribing to a false tax return are that on or

25    about the date alleged in the Indictment -- or the Information,

Exhibit 3 - Page 70

1    in the District of Oregon, the defendant made and signed a tax

2    return for 1998 that he knew contained materially false

3    information, and that the return contained a written

4    declaration that it was being signed subject to the penalties

5    of perjury, and that defendant acted willfully.

6          The evidence, your Honor, would be that in the early

7    part of 1998, the defendant and his wife made substantial loans

8    to a limited liability company, Specialty Finance Investors,

9    referred to as SFI, whose members were their siblings.

10         SFI used these loans to buy stock in Wilshire

11   Financial Services Group on March, and the loans were secured

12   only by the stock acquired.

13         Members of Mr. Wiederhorn's family, who were members

14   of SFI, have told investigators that they were not involved in

15   the management or the decision-making activities of SFI.

16         In about August of 1998, the stock price of WFSG

17   declined substantially.  As a result, brokerage houses through

18   which SFI had purchased the stock on margin began making margin

19   calls on SFI.

20         The defendant's wife and the fund managed by her,

21   called TTMM, loaned SFI additional funds to meet these margin

22   calls.  By October 1998, SFI's total indebtedness to the

23   Wiederhorns and TTMM was approximately 7.8 million dollars.

24   SFI was unable to repay these loans.

25         At the end of 1998, Mr. Wiederhorn's accountants and

Exhibit 3 - Page 71

1    tax attorneys recommended that the SFI notes be sold to

2    generate a capital loss.  The fair market value of the notes

3    was estimated at 17,439 dollars and change.

4         Mr. Wiederhorn's tax attorney prepared the paperwork

5    for the sale on or about December 30th, 1998.  On that date,

6    defendant arranged to have an entity known as Longpond, Inc.,

7    purchase the SFI notes at that estimated value of 17,000

8    dollars, plus.

9         All of the stock of Longpond was owned by an

10   acquaintance of the defendant's named Bud Coleman.

11   Mr. Wiederhorn managed Longpond.

12        Without Coleman's knowledge or authorization, the

13   defendant arranged to have 17,439 dollars and 77 cents paid out

14   of Longpond's bank account to purchase the SFI Promissory

15   Notes.

16        This transaction produced on paper a capital loss of

17   approximately 7.4 million dollars.  This loss was reported on

18   the Wiederhorn's 1998 tax return, which was made and signed in

19   Oregon on or about October 1999.

20        The loss claimed on this return from the sale was not

21   legitimate, because the transaction occurred only on paper and

22   was not arm's length.

23        As the defendant knew, when he signed the return, the

24   Longpond purchase of the SFI Promissory Notes was not a

25   bonafide arm's-length transaction between two willing parties,

Exhibit 3 - Page 72

Page 58

1    and lacked economic substance, not resulting in a true sale.

2            The defendant controlled both sides of the

3    transaction, and Longpond's bank account.  The defendant acted

4    without Mr. Coleman's knowledge or authorization.

5            The defendant's attorneys and accountants were not

6    aware of the lack of substance to this transaction.

7            By the end of 1998, the Wiederhorns had suffered

8    capital losses unrelated to their loans to SFI that exceeded

9    the capital gains realized earlier in the year.

10           The 7.4 million dollar capital loss attributed to the

11   SFI Longpond transaction therefore did not reduce

12   Mr. Wiederhorn's tax obligation for 1998 or any other year.

13           THE COURT:  All right.  Excuse me just a moment.

14           Mr. Wiederhorn, did you understand the elements of the

15   charge in Count 2?

16           THE DEFENDANT:  Yes, your Honor.

17           THE COURT:  Mr. Blackman, is there an issue?

18           MR. BLACKMAN:  No, your Honor.

19           THE COURT:  Okay.

20           And did you understand Mr. Caldwell's summary of the

21   facts from the Government's perspective, concerning his

22   assertion of what the evidence would prove?

23           THE DEFENDANT:  Yes, your Honor.  I understand

24   Mr. Caldwell's statements.  I'm not sure I agree with every one

25   of them, but I do understand them.

Exhibit 3 - Page 73

1           THE COURT:  Are there any that cause you concern at

2     the moment?

3           THE DEFENDANT:  Your Honor, I do agree that I

4     controlled the transaction to sell the notes from Specialty

5     Finance Investors, SFI, to Longpond.

6           I don't agree that I managed Longpond, your Honor, but

7     I did control both sides of the transaction.  And I do believe

8     that the transaction lacked economic substance, as I understand

9     that to be.  And that I set the price for the sale, with my

10    accountants' and the attorneys' advice, and their construction

11    of the transaction.

12          THE COURT:  Is that discrepancy material, from your

13    perspective?

14          MR. CALDWELL:  I don't believe it is, your Honor.

15          THE COURT:  All right.  Did you sign the tax return in

16    October of 1999, in the District of Oregon, that had the

17    overstated capital loss, as alleged?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  And you did that knowingly?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  How do you plead to the charge in Count 2?

22          THE DEFENDANT:  Guilty, your Honor.

23          THE COURT:  All right.  So I'm satisfied

24    Mr. Wiederhorn is fully competent today.  He is making a

25    knowing, intelligent, and voluntary waiver of his rights.  I

Exhibit 3 - Page 74

1    find his pleas of guilty to Counts 1 and 2 of the Information

2    also are knowing, intelligent, and voluntary.

3             I am accepting the pleas, pursuant to 11 -- Rule

4    11(c)(1)(4).  But I want to, for the record, have an explicit

5    exchange with Mr. Wiederhorn, rejecting the plea agreement, and

6    then allowing him to make the choice about whether to withdraw

7    the pleas I've just accepted.

8             So technically what has happened, Mr. Wiederhorn, is

9    that you have pled guilty.  I've accepted your pleas of guilty.

10   I have told you in various ways throughout the proceedings this

11   afternoon that I do not accept in its entirety the plea

12   agreement you formed with the Government.

13            As such, you have the right, now, to withdraw the

14   guilty pleas you just entered.  And if you want to withdraw

15   them, you have the absolute right to do so.

16            If you do not withdraw those guilty pleas, I will

17   sentence you, according to your plea agreement, with two

18   modifications indicated.

19            I will impose a 25,000 dollar fine, even though your

20   plea agreement doesn't call for it.  And I will impose the

21   travel restrictions that I described to you, even though your

22   plea agreement says you would have release and voluntary

23   surrender without any restriction.

24            Do you understand?

25            THE DEFENDANT:  Yes, your Honor, I do.

Exhibit 3 - Page 75

1            THE COURT:  Do you want an opportunity to talk with

2    your counsel before you go forward?

3            THE DEFENDANT:  No, your Honor.  I don't think that's

4    necessary.

5            THE COURT:  Do you choose to withdraw your pleas, or

6    do you stand by your pleas of guilty?

7            THE DEFENDANT:  I stand by my pleas of guilty, your

8    Honor.

9            THE COURT:  All right.  I'm satisfied the defendant is

10   also making a knowing, intelligent, and voluntary decision of

11   that matter.

12           Now, Mr. Wiederhorn, normally, one would have the

13   right to wait the imposition of sentence.  And, typically, the

14   reason for that is that it takes time to prepare a presentence

15   report.

16           But in your circumstances, the probation department

17   prepared in advance, at my request, the so-called pre-plea

18   presentence report.

19           Do you have a copy of that?

20           MR. BLACKMAN:  He doesn't, your Honor.  But counsel

21   does, and he has reviewed it.

22           THE COURT:  It is required that you have had a chance

23   to review the presentence report and to assure yourself that

24   you've read it, that you know what's in it.

25           Have you?

Exhibit 3 - Page 76

Page 62

1            THE DEFENDANT:  Yes, your Honor, I have.

2            THE COURT:  Have you discussed it fully with your

3    attorneys?

4            THE DEFENDANT:  Yes, your Honor.

5            THE COURT:  All right.  Now, before we go forward,

6    then, to the imposition of sentence, Mr. Caldwell, is there

7    anything the Government wants to add in that respect?

8            MR. CALDWELL:  No, your Honor.  We stand by the

9    agreement.

10           THE COURT:  All right.  Mr. Blackman, is there

11   anything you want to add on Mr. Wiederhorn's behalf with

12   respect to sentencing?

13           MR. BLACKMAN:  No, your Honor.

14           THE COURT:  Mr. Wiederhorn, is there anything you

15   would like to say before I impose the sentence to which you

16   have agreed?

17           THE DEFENDANT:  No, your Honor.

18           THE COURT:  All right.  The Court adopts the findings

19   of the presentence writer, and thanks Ms. Parashos for the

20   excellent work in this regard.

21           The Court adopts all of the guidelines analyses, as

22   summarized on the face sheet of the presentence report.

23           With respect to Count 1, the Base Offense Level is 6.

24   Under Guideline 2E5.1B2, 16 levels were added.

25           With respect to Count 2, the Base Offense Level is 6.

Exhibit 3 - Page 77

1  Adjusting the offense level for Count 1, the Adjusted Offense

2  Level is 22.  The Adjusted Offense Level for Count 2 is 6.  The

3  multiple-count adjustment results in a combined offense level

4  of 22.

5          The defendant is entitled to three levels off for

6  accepting responsibility, for a Total Offense Level of 19, a

7  Criminal History Category 1, and a sentencing range before

8  departure of 30 to 37 months.

9          Mr. Caldwell, do you have a Motion for Departure?

10          MR. CALDWELL:  Your Honor, we move for a downward

11  departure, pursuant to Section 5K1, for the reasons stated in

12  the plea agreement and in the presentence report, and a motion

13  which I believe the defendants will join in, for four levels;

14  based on the extensive reliance by Mr. Wiederhorn on attorneys

15  and accountants.  Again, as set forth in detail in the

16  presentence report.

17          THE COURT:  Is there any comment you want to make, or

18  anything to add in respect to that motion, Mr. Blackman?

19          MR. BLACKMAN:  Your Honor, I guess the only thing I

20  would add, because it wasn't really part of the recitation with

21  respect to the offenses, that highly respected, highly regarded

22  lawyers and accountants were involved in, for example, "The

23  Hand That Feeds You" transaction, the sale credit transaction,

24  from day one to day last.  Not just at the end; "The Hand That

25  Feeds You" that was described here.

Exhibit 3 - Page 78

1          And that whether one thinks it makes sense or not, we

2    do -- have concluded and advised Mr. Wiederhorn that as the

3    Ninth Circuit has construed 18 USC Section 1954, good faith

4    reliance on the advice of counsel is no defense if one engages

5    in a transaction that constitutes a gratuity.

6          And that, therefore, despite the good faith reliance

7    on the advice of counsel, that there is in fact no defense to

8    the charge on the elements.  But that that's exactly the kind

9    of circumstances that the guidelines anticipate being the

10   grounds for a departure, because they are not taken into

11   account by the guidelines.

12         THE COURT:  I think that's your phone distracting,

13   Mr. --

14         MR. BLACKMAN:  I don't believe it is, but --

15         THE COURT:  No?  Well, your office just picked it up.

16         MR. BLACKMAN:  It may be telling me that I have an

17   appointment, your Honor, but --

18         THE COURT:  Let's get it settled, so that your train

19   of thought and mind isn't interrupted.

20         Maybe you can assist your able colleagues there.

21         (Pause, conferring.)

22         MR. BLACKMAN:  This is to remind me to be at the

23   reception for my son's high school graduation today, your

24   Honor.

25         THE COURT:  We will seek to do so.

Exhibit 3 - Page 79

1            MR. BLACKMAN:  I appreciate that.  And I apologize.

2            THE COURT:  Now, back to Mr. Wiederhorn.

3            Were there other matters you wanted to add concerning

4    the advice of counsel issue?

5            MR. BLACKMAN:  No.  Only that I believe that it is an

6    appropriate grounds for departure, because it is a circumstance

7    not taken into account at all and in fact not a defense.

8    Subjecting a client -- which is, to me, the most difficult part

9    of this whole case, subjecting the client to the punishment for

10   the mistakes of the lawyer.  And as the presentence report I

11   think confirms, the lawyers just were unaware that this statute

12   existed.  And I think everyone agrees that had they been aware

13   of it, these transactions would not have occurred.

14           THE COURT:  The presentence report, which is not

15   public record, does corroborate Mr. Blackman's summation of the

16   facts underlying this aspect of the plea agreement.  And it is

17   accurate that under United States versus Soares, it is

18   absolutely no defense to a charge, such as a Section 1954

19   allegation, that a person gave a gratuity to the type of

20   individual described in the statute, with the explicit intent

21   and linkage between the giving of the gratuity and a decision

22   by such a fiduciary.  It's no defense that the person also had

23   affirmative advice of counsel, or other professionals, in so

24   doing.

25               That is in fact not a fact or factor taken into

Exhibit 3 - Page 80

1    account by the guidelines in formulation of a disposition for

2    this type of crime.  And in the unusual and extensive and

3    complicated factual circumstances here, it is a factor that

4    warrants the exercise of discretion, in my judgment, to

5    acknowledge the reality of the circumstances.

6             The Court is granting the Government's motion for a

7    downward departure based on Guideline 5K1 -- pardon me, 5K2.0

8    for four-level downward departure.

9             And that results in a final offense level of 15, a

10   Criminal History Category of 1, and a guideline range of 18 to

11   24 months.

12            The Court has given considerable thought to the

13   parties' resolve -- or resolution -- agreed resolution -- the

14   18-month prison sentence, and the 2 million dollar restitution

15   obligation, and now the additional 25,000 dollar fine, which

16   the Court has determined also is warranted.  And when one

17   considers all of the vagaries of this particular statute,

18   Section 1954, the difficulties of assembling and marshalling

19   all of the evidence to prove such a violation, and all of the

20   other complications surrounding the entire Capital Investment

21   investigations, the certainty that this agreement and this

22   disposition has achieved for the benefit of the people of the

23   District of Oregon is an important factor that weighs in favor

24   of the Court acknowledging the parties' resolution.  And,

25   therefore, I'm satisfied that an 18-month sentence is the

Exhibit 3 - Page 81

Page 67

1    proper outcome here.

2         It is, for a person of Mr. Wiederhorn's background, in

3    the sense that he has no criminal record, he has made it to age

4    38 without any significant issue in this regard, a significant

5    sanction to spend 18 months in prison; whether that's in a camp

6    or in the regular correctional facility.  It will be he and no

7    one else who does that time.

8         The Court is persuaded that is in fact a very serious

9    sanction and probably one that will impact him much more than

10   the payment of 2 million dollars restitution, which is also

11   part of the Court's judgment, and which is due immediately and

12   payable today, Mr. Blackman.

13        MR. BLACKMAN:  Yes, your Honor.

14        THE COURT:  The Court imposes the 25,000 dollar fine,

15   as indicated.  The Court concludes the defendant is suitable

16   for release on his own recognizance, after processing by the

17   United States Marshal, and subject to the travel restrictions

18   as I've indicated.

19        Mr. Wiederhorn, you need to surrender your passport

20   promptly to the Pretrial Services officer.  And from this

21   proceeding, you'll go with the Pretrial Services officer to the

22   marshal's office for intake and for your other processing.

23        I've signed an order authorizing your release on your

24   own recognizance after that processing.

25        Now, the restitution obligation, I've indicated the 2

Exhibit 3 - Page 82

```
 1   million dollar obligation is in favor of the receiver of

 2   Capital, as indicated in the presentence report.  The Court is

 3   not imposing any period of supervised release because, in the

 4   circumstances of this case, none of the factors that warrant

 5   supervision apply.

 6           And, therefore, upon the conclusion of the defendant's

 7   prison term, his criminal obligations are complete.  That is

 8   provided.  And conditioned on the Court not imposing a

 9   condition of supervised release is that the defendant, of

10                  ily surrender at a time and place indicated,

11   and that he not violate any condition of his release between

12   now and his surrender date.  Explicitly, he must obey the law,

13   he must follow the directions of his release officer, and he

14   must report and surrender at the time and place indicated by

15   the marshal.

16           Now, we talked about tentative dates yesterday.

17   August 15, August 1.

18           Was there --

19           MR. BLACKMAN:  I think August 2 is a Monday.  August

20   2nd, your Honor.

21           THE COURT:  All right.  Then the defendant is to

22   surrender voluntarily to the facility identified by the United

23   States Marshal on August 2, or on such other date as the

24   marshal may direct.  It may be sooner, it may be later.  I

25   doubt if it will be much sooner.  It depends upon the Bureau of
```

Exhibit 3 - Page 83

1    Prisons' designation process.

2            The Court does recommend, Mr. Wiederhorn, that the

3    Bureau designate you to a prison camp, which is not a -- a

4    correctional facility, simply because it is my judgment that

5    you do not require the level of security that would be

6    warranted in a correctional facility.  Nonetheless, it's not my

7    decision.  It is up to the Bureau of Prisons to determine at

8    what kind of a facility you will be placed and where that will

9    be.

10            The Court acknowledges the defendant has significant

11   ties in the community, here in Oregon, and recommends that the

12   defendant be designated to whatever facility -- camp or

13   otherwise -- as near to Oregon as may be possible.

14            Mr. Caldwell, are there other matters I need to

15   address?

16            MR. CALDWELL:  No, your Honor.

17            THE COURT:  Mr. Blackman, any other matters?

18            MR. BLACKMAN:  No, your Honor.  Thank you.

19            THE COURT:  Ms. Parashos, is there anything else

20   that --

21            THE PROBATION OFFICER:  No, your Honor.  Thank you.

22            THE COURT:  Mr. McFarland, anything else?

23            THE PRETRIAL SERVICES OFFICER:  No, your Honor.

24            THE COURT:  All right, then.  Mr. Wiederhorn, you have

25   entered two pleas of guilty.  I have sentenced you pursuant to

Exhibit 3 - Page 84

1    your plea agreement.  You are now subject to the directions of

2    the Court.  You need to go to the marshal's office for

3    processing.  Follow Mr. Blackman and Mr. McFarland's

4    directions.

5              I wish you well, sir.  Good luck.

6              THE DEFENDANT:  Thank you.

7              THE COURT:  You'll take care of the financial matters.

8    Yes, counsel?

9              MR. CALDWELL:  Yes, we will, your Honor.

10              THE COURT:  All right.  We are in recess, then.  Thank

11    you.

12

13              MR. BLACKMAN:  Thank you, your Honor.

14              (Conclusion of proceedings.)

15                            - 0 -

16

17

18

19

20

21

22

23

24

25

Exhibit 3 - Page 85

Page 71

1

2                                --oOo--

3

4    I certify, by signing below, that the foregoing is a correct

5    transcript of the oral proceedings had in the above-entitled

6    matter this 15th day of June, 2004.

7

8                    _____

9                    AMANDA M. LeGORE, RDR, CRR, FCRR, CE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 3 - Page 86